**UNITED STATES of America**

**v.**

**Frank W. WINSTON, Appellant.**

**No. 22917.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 11, 1970.

Decided June 30, 1971.

Matthews, Senior District Judge, dissented and filed opinion.

Mr. Benjamin R. Achenbach, Jr., Washington, D. C., with whom Mr. Robert Reed Gray, Washington, D. C. (both appointed by this Court) was on the brief, for appellant.

Mr. Terry P. Segal, Asst. U. S. Atty. with whom Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Before BAZELON, Chief Judge, LEVENTHAL, Circuit Judge, and MATTHEWS,* Senior Judge, U. S. District Court for the District of Columbia.

LEVENTHAL, Circuit Judge:

The appellant was convicted of assault with intent to commit robbery, assault with a dangerous weapon, and possession of a pistol without a license. He was sentenced to eight years of imprisonment under the Youth Corrections Act. We cannot sustain the conviction on the present record, but conclude that in the interest of justice the record should be remanded to clarify a matter that may provide a basis for sustaining the conviction.

*Prosecution Evidence of Defendant's Commission of Crime*

The sole evidence linking appellant with the crime was testimony of Eugene Carbo,[1] the victim of the assault, as follows:

Mr. Carbo was admitting employees to the Hechinger Company building on the morning of September 12, 1967, when three persons approached. Taking them as employees, Mr. Carbo pressed the button that opened the door. He realized his mistake and closed the door after two of the men entered, but before the third got through. The man later identified by Mr. Carbo as the appellant pulled a gun, grabbed the front of Carbo's shirt, said "This is a stick-up, man," and ordered him to open the door to admit the third companion. When Carbo said there was no money in the office, the gunman shot him in the chest at close range and fled. Carbo testified that seeing conditions were good in the office, and that his

* Sitting by designation pursuant to Title 28, U.S.Code, Section 292(a).

1. His name is spelled "Carbo" in the transcript and Government brief; there are other references in the file to "Carbough."

seven years' experience in the Military Police had taught him to observe faces carefully.

*Initial Ruling On Inadmissibility by Prosecution of Identification at Preliminary Hearing*

On cross-examination defense counsel asked questions testing Carbo's ability to observe and make the identification, *e. g.*, elicited Carbo had only seen defendant a minute and a half.

The prosecutor, at bench conference, contended that defense counsel was challenging the in-court identification, and this "has opened the door" to permit the prosecution to show Mr. Carbo's previous identification of appellant in a General Sessions courtroom on the day of the preliminary hearing. Defense counsel raised the possibility that the police officer had pointed appellant out. The court held a hearing out of the presence of the jury. Mr. Carbo testified that prior to the preliminary hearing he was asked to walk down the hall and observe people in the hall and courtrooms and see if there was anyone he could identify. He saw defendant in a courtroom where there were some 30 or 40 persons, white and black, male and female. He went back and told the detective he did see someone he recognized. The detective suggested Mr. Carbo walk through the courtroom, and when Mr. Carbo was "shaky" volunteered to go with him. They went past the man and Mr. Carbo identified him. Mr. Carbo said he had not been prompted by the police officer. (Tr. 28–31.)

The court held that this identification in a General Sessions courtroom was not admissible under United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), that the police had in effect allowed a situation to develop hoping it would be comparable to a lineup, without notifying defendant's attorney about the impending confrontation.[2]

This ruling is within the ambit of our decisions in Mason v. United States, 134 U.S.App.D.C. 280, 414 F.2d 1176 (1969), that identifications at preliminary hearing must comport with *Wade*, and (Anthony) Long v. United States, 137 U.S. App.D.C. 311, 424 F.2d 799 (1969).[3]

After hearing testimony as to a photographic identification by Mr. Carbo shortly after the crime, the court held this had not been unduly suggestive, that Mr. Carbo's in-court testimony was untainted by the identification in the General Sessions courtroom, and would not be stricken.

*Rulings on the Prosecutor's Rebuttal Presentation of General Sessions Identification*

Appellant then presented an alibi defense. On direct examination he testified that on the morning of September 12, he had not been in Hechinger's or seen Mr. Carbo. Asked when he had first seen Mr. Carbo, he replied in the Court of General Sessions before his preliminary hearing started.[4] The pros-

2. In colloquy (Tr. 25–26) the prosecutor noted that Carbo had appeared at the preliminary hearing at the request of defense counsel. But defense counsel responded that the defense attorney had asked appellant to go into a room other than the General Assignment Room, and then the police officer and Mr. Carbo had come into this other room.

3. The *Long* ruling held that there was a violation of *Wade* in the arrangement made by the police for an unstructured meeting in the Robbery Squad room. Another ruling in *Long* admitted an identification in a spontaneous chance meeting in the elevator; the case before us has no such element of spontaneity.

4. This was the relevant questioning, on direct:

Q: Were you in that store at all?
A: No.
Q: Have you ever seen the complaining witness, Mr. Carbo before?
A: Not before when I seen him in this Court.
Q: You did not see him on the morning of September 12?
A: No, sir. (Tr. 112)

* * * * *

ecuting attorney declared that this reference to the preliminary hearing provided the basis for "rebuttal" testimony by Mr. Carbo concerning the identification in the Court of General Sessions. The judge, with express misgiving,[5] permitted Mr. Carbo to testify.

Six days after conviction, on July 29, 1968, appellant filed a motion for a new trial. As the close of argument on the motion on December 6, 1968, the judge announced that the motion was granted, because the rebuttal testimony had been improperly admitted. On December 13 the trial judge *sua sponte* reconsidered his ruling, heard argument, and took the motion under advisement. On February 14, 1969, the trial judge sentenced the appellant; stating that he had concluded that the trial error was harmless error. Four days later he filed an order formally reversing his ruling of December 6.

*Approval of Trial Judge's Rejection of "Opening the Door" Contention*

On appeal the Government does not argue (though it apparently does not concede) the propriety of the trial judge's ruling that evidence of the General Sessions identification was inadmissible as such. Its contention is that "Once appellant's counsel elicited testimony about the General Sessions confrontation, the prosecutor was entitled 'to fill the gaps' created by the incomplete account." (Br. 8) Its theory is that once appellant had "opened the door" on evidence otherwise inadmissible, the Government can introduce such evidence in its entirety, not merely for impeachment, but in the interest of truth.

The judge did not admit the rebuttal in the first instance on the theory of "opening the door," dubbed "curative admissibility" by Wigmore. 1 J. Wigmore, Evidence § 15 (3d ed. 1940). His view was that since appellant had indicated that the witness had seen only him and his mother in the courtroom, and since the witness had earlier testified, outside the presence of the jury, that there were 30 persons present in the courtroom where he saw appellant, the prosecution should be allowed to put in the testimony, not on general opening the door grounds, but to impeach appellant's statement by contradiction.[6] Later, the trial judge felt there was error because the inadmissible testmony—which as he had noted established a viewing without counsel on which counsel had no basis for cross-examination (Tr. 131)—had been permitted on the point of providing direct impeachment by contradiction, yet ultimately there had been no contradiction, since Mr. Carbo's testimony confirmed that when

Q: When did you first see the complaining witness?
A: At the preliminary hearing.
Q: Did you see him at any time before the preliminary hearing?
A: You mean before the hearing started?
Q: Yes.
A: Yes, I did. Me and my mother was standing in the courtroom when they were going to have the hearing—the preliminary hearing that was to take place.
THE COURT: Where was that?
A: In the General Sessions Court. We were standing there and the complaining witness, and Detective [Greenwell]. That was the first time I'd seen him.
Q: That was the first time you had ever seen him?
A: The first time in my life.
Q: And the second time was when he testified; is that right?
A: That's right. (Tr. 113)

5. "THE COURT: Very well, I will let you call him. My nose tells me that there's something wrong with this." [Tr. 131.]

* * * * *

"THE COURT: Well, I have great doubt. I will let him testify." [Tr. 140.]

6. This approach accepted the prosecution's position that defendant's testimony suggested that only he and his mother were in the room at the time, although that was not stated in so many words (see note 4).

defendant saw him defendant was alone with his mother.[7]

The trial judge was definite that the rebuttal was not admissible on a theory of "opening the door." He first called attention to the opinion of another District Judge in United States v. Clark,[8] as establishing that when defendant's testimony puts the witness's identification in issue, he opens up the area and the Government may explore. (See Tr. 129.) But he did not think it followed that the mere testimony by defendant that he had never seen the witness prior to the preliminary hearing permitted the Government to introduce testimony about the facts which was forbidden on direct because of denial of constitutional rights (Tr. 130). The trial judge put it expressively (Tr. Dec. 13, 1968, p. 8):

> "This business about 'opening the door' is a much overused issue and it carries with it an oversimplification. Opening the door is one thing. But what comes through the door is another. Everything cannot come through the door. This witness' testimony was certainly not in rebuttal to anything that the defendant testified to."

We agree with the reasoning of the trial judge. As noted in United States v. McClain, 142 U.S.App.D.C. 213, 216, 440 F.2d 241, 244 (1971): "The doctrine of curative admissibility is one dangerously prone to overuse." Permission to explore in rebuttal with testimony not admissible on direct, on the ground that the other party has opened the doors, rests "upon the necessity of removing prejudice in the interest of fairness." Crawford v. United States, 91 U.S.App.D.C. 234, 237, 198 F.2d 976, 979 (1952).[9]

The doctrine is to prevent prejudice and is not to be subverted into a rule for injection of prejudice. Introduction of otherwise inadmissible evidence under shield of this doctrine is permitted "only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence." California Ins. Co. v. Allen, 235 F.2d 178, 180 (5th Cir. 1956).

The *Clark* decision, *supra* note 8, shows that the doctrine may permit rebuttal use of pretrial identifications that are otherwise inadmissible because of constitutional violations. However, in view of the constitutional rights involved, the court must be particularly clear that the case is appropriate for curative admissibility.[10] In a case of constitutionally-grounded exclusion, there is a requirement of clear showing of prejudice before the open-the-door rule of rebuttal may be involved. The rule operates to prevent an accused from successfully gaining exclusion of inadmissible prosecution evidence and then extracting selected pieces of this evidence

7. Apparently there were two, or perhaps three, viewings of appellant, possibly in two courtrooms. Mr. Carbo testified that the first time he saw defendant, through the glass door, he was in a courtroom with 30 people. (Tr. 140–141.) Then Mr. Carbo went down to the other end of hallway to tell the detective. He said this testimony about the other people in the room did not relate to the time when he was with the detective. And he expressly confirmed that when he later walked into a courtroom and was seen by defendant, defendant and a woman were by themselves. (Tr. 144.)

8. 294 F.Supp. 44 (D.D.C. June 17, 1968.) This ruling was subsequently affirmed in Clark v. United States, reported sub nom. Clemons v. United States, 133 U.S. App.D.C. 27, 43, 408 F.2d 1230, 1246 (Dec. 6, 1968 en banc), cert. denied, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed. 2d 567 (1969). (Counsel for defendant Clark had initially brought out the fact of the cellblock confrontation and the court held the Government was entitled to give its version of that confrontation.)

9. See also United States v. Monroe, 141 U.S.App.D.C. 251, 437 F.2d 684 (1970); Twachtman v. Connelly, 106 F.2d 501, 506 (6th Cir. 1939).

10. C. McCormick, Evidence, pp. 133–34 (1954). See *e. g.*, the case against undue application of the opening up doctrine in the ruling as to Clemons in Clemons v. United States, *supra* note 7, 133 U.S. App.D.C. at 45, 408 F.2d at 1248.

for his own advantage, without the Government's being able to place them in their proper context. These were not, however, the circumstances of this case.

Appellant's testimony (*supra*, note 4) as to when he first saw the complaining witness bears no significant identification of any steering or impropriety on the part of Mr. Carbo or the detective. The possibility of prejudice to the Government is minimal. The principles discussed above confirm the view of the trial judge that the opening-the-door rule did not justify the prejudice of a rebuttal that established a viewing initiated without respecting appellant's constitutional rights.

*Error of the Trial Judge In Ruling There Was No Prejudicial Error*

In the course of sentencing, and in his February 18 reversal of his December 6 ruling, the trial judge reflected his position that the admission of the rebuttal, though erroneous, was not prejudicial error.[11] In our view the error cannot be considered non-prejudical beyond a reasonable doubt under the standard of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Testimony of pre-trial identification is more impressive to the jury than the taken-for-granted in-court identification,[12] as will be noted below. The error involved constitutional rights. It cannot be concluded beyond a reasonable doubt that the evidence did not contribute to the conviction and therefore calls for application of the "harmless error" doctrine.[13]

In his statement at sentencing that the error was not prejudicial, the trial judge relied on the positiveness of the victim's trial testimony and the strengths of the initial observation by this witness at the scene. We assume that this on-the-scene observation was strong enough to provide the clear and convincing evidence needed to establish that an independent source made the witness's in-court identification valid and proper. But it goes much further to permit introduction of inadmissible evidence of a pre-trial confrontation, with all its persuasiveness (see Clemons v. United States, *supra* note 12), where otherwise there would be only the in-court identification. The trial judge apparently felt that he had no doubt that there was no mistaken identification. But he erred in approaching the issue on the basis of a court determination whether there had been a misidentification, for the ultimate question is different, namely, whether the error may have affected the verdict of the jury.[14]

While Mr. Carbo has the earmarks of a responsible witness, and he is to be lauded for his citizenlike efforts to cooperate in apprehending criminals, we cannot ignore certain flaws in his testi-

11. At sentencing the judge relied on both Mr. Carbo's opportunity to observe in the first place, and his having chosen a picture of defendant from among several. He also referred to the erroneous admission of testimony as "through inadvertence." (Tr. of Feb. 14, 1969, at 3.)

12. Clemons v. United States, *supra* note 8, 133 U.S.App.D.C. at 40, 408 F.2d at 1243.

13. "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Fahy v. Connecticut, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963).

In Chapman v. California, 386 U.S. 18, 23–24, 87 S.Ct. 824, 827, 17 L.Ed. 2d 705 (1967), the Court said: "An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, under *Fahy*, be conceived of as harmless. * * We, therefore, do no more than adhere to the meaning of our *Fahy* case when we hold, as we do now, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."

14. If the trial court had been focusing on the impact on jury he would not have relied (see note 11) on the photographic identification, which was not in evidence before the jury.

mony which, at least in combination, present enough questions as to his reliability to preclude a judge from concluding beyond a reasonable doubt that he would have been believed by the jury if not reinforced by the tainted evidence of pretrial identification.[15]

*Remand To Consider Possibility of Different Reason for Sustaining Conviction*

After the rebuttal testimony, the Government rested, and a luncheon recess was called. The transcript reveals that after lunch the counsel presented their summations to the jury. It is asserted, however, in the Government's Opposition to the post-verdict motion for new trial, that the court returned from lunch to announce that it had second thoughts about the propriety of the rebuttal and then ruled that the rebuttal was improper as having gone beyond permissible impeachment of the defendant's statement on direct examination.

There is an indication—we do not know whether it is a fact—that defense counsel did not ask for mistrial but asked for acquittal. The court said he was not entitled to an outright acquittal, and we agree. The problem that concerns us is the possibility that defense counsel was aware of a mistrial possibility and bypassed it.[16] The record as it stands does not reflect the pre-

15. He claimed special abilities in observation and identification from seven years in the military police, and testified: "This is something that was implanted on my mind; something that shocked me and I'll never forget it." (Tr. 22) Yet shortly after the crime he described the assailant to the police as wearing a brown, waist-length coat (Tr. 59–60), while at the trial he described the defendant as having worn a black, car-coat-length jacket (Tr. 15).

The Government offered an explanation at oral argument by referring to the colloquy when the prosecutor first claimed that defense counsel's cross-examination of Carbo had "opened the door" sufficiently to permit introduction of the General Sessions identification. The trial judge asked whether the witness gave a description to the police. The prosecutor replied, "Well, he did give a sketchy description but then he blacked out." (Tr. 25)

(1) In the first place the immediate reference to the brown, waist-length coat is not "sketchy." It is specific enough, just different from the equally specific description of the coat at trial.

Moreover, the prosecutor's statement (a) was not evidence and (b) gives no useful information either as to the witness's state at the time he gave the description or as to the lapse of time between the description and the black-out.

(2) The witness's statement of special abilities in observation and identification must also overcome his error in admitting the offenders in the first place. He explained he thought they were employees of another department. But if one admits someone he does not recognize, what was the point of the elaborate buzzer-admittance system?

(3) Other items in the testimony of the complaining witness cast doubt on his ability to remember facts accurately and to present them without giving an inflated impression of their reliability.

(a) Thus, when the witness was asked by defense counsel whether he got a good look at the three men involved in the crime he said, "Well, a fairly good look." When pressed slightly by the appellant's trial attorney he rephrased it,—"Well, I took a look at him." (Tr. 19).

(b) At another point the witness was shown a photograph, apparently prepared from a slide, which he said he had seen before. Asked when, he qualified:

"A: That's not the one I saw on the slide. Q: Have you ever seen that photograph? A: No, I'm not sure of that. That's not the one I saw on the slide." (Tr. 46–47).

16. Possibly he was hoping for acquittal and regarded the record at trial as more advantageous than what would eventuate on a new trial.

Our concern with the possibility of a tactical decision by defense counsel springs from the statement at p. 3 of the Government's Opposition to defendant's Motion to Set Aside Verdict, filed August 30, 1968, that "Defense counsel requested a judgment of acquittal. The Court said that he could not get *that.* Defense counsel made no request for a mistrial or that the testimony given in rebuttal be stricken."

cise trial situation,[17] but the record as amplified may lead to the conclusion that the interest of justice does not warrant a reversal or new trial. We remand the record to the trial judge to provide findings and recommendations on this matter.[18]

Remanded.[19]

MATTHEWS, Senior District Judge (dissenting):

In the course of an attempted holdup, an accountant employed by Hechinger Company was shot in the chest a half inch or less from the heart, and his assailant fled.

Three days after the shooting, the victim selected a photograph of his assailant from 12 to 14 representative black and white photographs shown to him by a police officer. The photograph selected was of appellant.[1] On the following day more than 50 color slides were thrown on the wall of the victim's hospital room and he identified a color slide of appellant as the person by whom he was shot. On the basis of this photographic identification, appellant was arrested.

Prior to trial government counsel informed the court and defense counsel that the victim of the shooting had been taken to a hospital where he selected appellant's picture first from a number of black and white photographs and later from approximately 50 color shots. The prosecutor also disclosed that on the date of appellant's preliminary hearing, the victim saw appellant sitting among 30 to 40 assignment court people in the Court of General Sessions, told a detective located in the hallway where appellant was seated in the courtroom, and later accompanied the detective into the courtroom to make an identification.[2]

The trial judge conducted a hearing out of the presence of the jury relative to the pretrial photographic identification and concluded that this identification was "positive and wholesome from the outset" and that the victim had "the power to identify this man [appellant], notwithstanding anything that happened in the General Sessions Courtroom." [3]

At the trial the victim made an in-court identification of appellant as the man by whom he was shot, the court ruling that such in-court identification

17. In general it would be helpful if trial judges would try to insure that the record reflects (a) any relief that was meaningfully available to defense counsel with respect to errors at trial, and also (b), where appropriate, a statement on the record that defense counsel declined for tactical reasons to seek relief or secondary relief.

Thus when a trial judge has overruled a defense objection or denied a defense motion, and defense counsel either fails to ask for secondary relief, such as a limiting instruction, or fails to renew his objection at the appropriate time, *e. g.*, by motion for acquittal or mistrial, it would be wise for the judge to call counsel to the bench and ask him to state for the record whether he has chosen to waive the point for possible tactical reasons. This may help to avoid the possibility that a later claim of error will be given recognition in the absence of a showing of intentional waiver, *cf.* United States v. McClain, cited above, in text accompanying note 9.

18. He may also conduct such proceedings incident to just disposition as he may deem appropriate, including, *e. g.*, taking of testimony. Thus he may wish to call on defense counsel to state why he did not seek mistrial. We do not say this is material if the fact is that the mistrial was available and bypassed. We merely indicate the range provided by our remand order, that the District Court may view the matter afresh and, as it were, in the first instance.

19. We defer ruling on appellant's contention that the trial judge had jurisdiction to reconsider his ruling granting a new trial.

1. This photograph was received as Government's Exhibit No. 1 at the hearing before the trial judge (out of the presence of the jury) on the photographic identification. (Tr. 51–53.) On its face the photograph carries the number 202796.

2. The attorney for defendant had requested that the victim be present at the court house on the day of the preliminary hearing.

3. Transcript, p. 108.

rested on a basis independent of the confrontation and identification in the General Sessions courtroom, the independent source being the witness' identification of appellant's photographs prior to trial.

The victim testified that he had been with the military police for seven years and in such connection had been taught to observe faces. He further testified that at the time of the attempted holdup, under three fluorescent lights, he was grabbed by the shirt, and that at arm's length he observed appellant until appellant, realizing that the stares of the victim were upon him, pulled something over his face. The victim described appellant as having "one eye that drooped slightly," [4] a mustache, and a small caliber gun, either .25 or .22, with a pearl handle. (Tr. pp. 13–15.)

In the government's case in chief the victim was not permitted to testify as to his confrontation and identification of appellant at the Court of General Sessions on the day of the preliminary hearing, the court holding that evidence of such confrontation and identification would be violative of defendant's right under the Sixth Amendment in that defendant's counsel was not present at that time. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

However, the fact of the confrontation in the General Sessions courtroom was brought out initially by the defense itself when the defendant took the witness stand to interpose an alibi defense.

After the defendant testified that he had not *ever* seen the complaining witness before he saw "him in this [District] court" (Tr. 112), he was pressed by his attorney as to when he first saw the complaining witness, and whether the complaining witness was seen at any time prior to the preliminary hearing. The defendant then related that before such hearing began in the Court of General Sessions he and his mother were standing in the courtroom as was the complaining witness and a police detective, and that this was the first time in his life he had seen the complaining witness, the second time being at the trial. The implication of this testimony was that the defendant and his mother were alone in the Court of General Sessions courtroom when the police detective entered with the complaining witness and prompted an identification of the defendant by the complaining witness. Under these circumstances, the trial judge ruled that since the defendant had initially gone into the matter of the confrontation and identification which took place immediately preceding the preliminary hearing, the government, by rebuttal testimony, might fill in the gaps and give its version of that confrontation.

This ruling of the trial court is consistent with the decision in United States v. Clark, D.C., 294 F.Supp. 44 (1968), affirmed *sub nom.* Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230 (1968) (*en banc*), cert. denied, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969). There the trial court said:

> "* * * [I]f for tactical reasons, defense counsel chooses to place before the jury an allegedly prejudicial confrontation, the Government should be permitted to defend the testimony of its witnesses by seeking to convince the panel of the unsuggestive nature of the challenged confrontation." 294 F.Supp. 44, 52–53.

Since in the case at bar I do not believe there was error in the admission of the rebuttal testimony, I respectfully dissent.

4. The defendant did indeed have such an eye according to the trial judge. Transcript of Dec. 13, 1968, p. 5.