Don BENTLEY, Appellant,

v.

STATE of Alaska, Appellee.

No. A–454.

Court of Appeals of Alaska.

Dec. 27, 1985.

Steve Cole, Asst. Public Defender, Kodiak, and Dana Fabe, Public Defender, Anchorage, for appellant.

James V. Gould, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

Donald Bentley was convicted of assault in the second degree, AS 11.41.210(a)(1), and appeals both his conviction and sentence. We find that the trial court erred in admitting evidence of certain past acts of Bentley and accordingly reverse the conviction.

Bentley was charged with assault in the second degree for allegedly stabbing Kenneth Nekeferoff. The stabbing occurred on board a fishing boat moored at the transient dock in Kodiak. Bentley, Nekeferoff and three others were the only persons on board the boat at the time. No one actually saw Nekeferoff get stabbed; indeed, Nekeferoff himself remembered very

little about the evening after the group left the bars.[1]

The state's key witness was Yvonne Pearson, Bentley's former girlfriend, who at the time was married and living in Kodiak. Pearson testified that Bentley came to her the day after the incident on the boat and confessed to stabbing someone. Pearson also testified that Bentley left a white-handled knife at her house, which she washed because it had blood stains on it.

On cross-examination, in an effort to show Pearson's bias, Bentley inquired into the circumstances of Bentley and Pearson's break-up:

Q  And some time thereafter the 2 of you broke up, correct?

A  That's true.

Q  And it was an ugly break, wasn't it? Yes or no.

A  Yes.

Q  And a lot of bad things were said back and forth between the 2 of you, weren't they?

A  Sure.

Q  And you were pregnant at the time, weren't you?

A  Yes, I was.

Q  And subsequently that child died, right? At birth?
....

A  Yes.

Q  And the child—in fact the child is even buried here in Kodiak, right?

A  Yes.

Q  And the child is a boy, right?

A  Yes.

Q  The child's death really hurt you, didn't it?

THE COURT: Do the best you can with it ma'am.

A  Yes.

Q  And you've become very bitter about it, haven't you?

A  No, I haven't. I think it was in the Lord's hands.

Q  You told Don that you blamed him for the death of your baby, didn't you?

A  Yes.

Q  And you—you said that you blamed Don for losing your house, don't you?

A  Yes, I do. But not totally. It helped.

Q  And that's—is that why you made up this story today?

Following Bentley's cross-examination, the state asked that the jury be excused and presented an offer of proof concerning the circumstances of the "break-up." The state's offer of proof included Bentley's neglect of Pearson while she was pregnant with his child, including Bentley's failure to provide a decent home for her, and his continual drug use. In addition, Pearson testified that Bentley had been arrested and was in police custody right after Pearson's baby died. Pearson described the baby's funeral where Bentley arrived in police custody and attempted only to seek out those who could help him get out of jail.

Bentley objected to the state's offer, but Judge J. Justin Ripley ruled that Bentley had opened the door to admission of the evidence by his impeachment of Pearson. Bentley appeals Judge Ripley's ruling, arguing the evidence was inadmissible under Evidence Rules 403 and 404(b).[2] We agree.

EXCLUSION OF RELEVANT EVIDENCE ON GROUNDS OF PREJUDICE, CONFUSION, OR WASTE OF TIME.

Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Alaska Rule of Evidence 404(b) reads:

---

**1.** The evidence presented indicated that all those present on the boat were extremely intoxicated. Nekeferoff was apparently "blacked out." One person on board, "Bobo" Boskofsky, testified that Bentley had flashed something at him that he thought was a weapon, then a few minutes later he saw Bentley's arm move against Nekeferoff. Bentley and Nekeferoff then left the boat ostensibly to take Nekeferoff to the hospital.

**2.** Alaska Rule of Evidence 403 reads:

At the outset, we note that the circumstances of Bentley and Pearson's falling out would have been inadmissible during direct-examination under either Evidence Rule 403 or 404(b). The circumstances were highly prejudicial and not clearly relevant to any issue pertinent to the case. Furthermore, there would have been no legitimate nonpropensity use for the evidence. Thus, admission of the evidence during direct would have been error under our recent decision, *Lerchenstein v. State*, 697 P.2d 312 (Alaska App.1985), *petition for hearing granted* (Alaska June 25, 1985).

The question in this case, however, is whether Bentley "opened the door" to the evidence by cross-examining Pearson to show the bias allegedly resulting from their falling out. "Opening the door" to otherwise inadmissible evidence is often referred to as the doctrine of "curative admissibility." *See* 1 J. Wigmore, Evidence § 15 (Tillers rev. 1983). The doctrine was recognized in *Leonard v. State*, 655 P.2d 766 (Alaska App.1982), but the scope of evidence admissible on redirect is apparently an open question in Alaska.

In *Leonard*, the defendant first agreed, then later refused to take a polygraph test. At trial, he sought and received a protective order excluding from evidence his refusal to take the polygraph. However, during Leonard's direct-examination, he stated that he agreed to take the polygraph when he was originally asked. The state, on cross-examination, was allowed to elicit his ultimate refusal. We held on appeal that there was no abuse of discretion in allowing the state to cure the misleading nature of Leonard's testimony.

We find the present case distinguishable. Unlike Leonard, Bentley did not present inadmissible evidence or mischaracterize a fact to the prejudice of the state. Bentley properly impeached Pearson for bias as permitted under Evidence Rule 613.[3] Furthermore, Bentley's cross-examination was not misleading. Pearson, apparently, had actual bias and admitted as much. *See Gilliam v. State*, 270 Ind. 71, 383 N.E.2d 297, 301 (1978) (evidence relied upon to "open the door" must leave the trier of fact with false or misleading impression of facts presented).

In addition, to the extent the cross-examination opened the door to a certain amount of explanation by the state, we find that far more than mere explanation was admitted here. In *United States v. Winston*, 447 F.2d 1236, 1240 (D.C.Cir.1971), the court wrote:

"Opening the door is one thing. But what comes through the door is another. Everything cannot come through the door...."

"The doctrine of curative admissibility is one dangerously prone to overuse." Permission to explore in rebuttal with testimony not admissible on direct, on the ground that the other party has opened the doors, rests "upon the necessity of removing prejudice in the interest of fairness."

The doctrine is to prevent prejudice and is not to be subverted into a rule for injection of prejudice. Introduction of otherwise inadmissible evidence under shield of this doctrine is permitted "only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence." [Citations and footnote omitted.]

PRIOR INCONSISTENT STATEMENTS—BIAS AND INTEREST OF WITNESSES.

(a) *General Rule.* Prior statements of a witness inconsistent with his testimony at a trial, hearing or deposition, and evidence of bias or interest on the part of a witness are admissible for the purpose of impeaching the credibility of a witness.

---

*Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**3.** Alaska Rule of Evidence 613 provides in part:

*Cf. United States v. Parr-Pla*, 549 F.2d 660, 663 (9th Cir.1977).[4]

We agree with the reasoning in *Winston* and hold that the trial court erred in allowing the state to inquire into all of the circumstances of the Bentley-Pearson break-up. The evidence the state introduced included Bentley's drug use, his purported neglect of Pearson while she was pregnant, his callous behavior at his baby's funeral, and the fact that he had been arrested and was in police custody at the time of the baby's funeral. Such evidence in no way "cured" the shadow of bias cast upon Pearson. The effect of the evidence was only to show what good reasons Pearson had to be biased and to discredit Bentley's character in front of the jury.

We believe that since the scope of the redirect exceeded that which is permissible under the doctrine of curative admissibility, a reversal is in order due to the inflammatory nature of the evidence presented. We cannot say that the error had no probable effect on the jury's verdict. *See Poulin v. Zartman*, 542 P.2d 251, 261 (Alaska 1975) (*quoting Love v. State*, 457 P.2d 622, 631 n. 15 (Alaska 1969)).

REVERSED.[5]

---

**4.** Wigmore discusses this issue as follows:

When to a witness is imputed hostility to the opponent, the true process of explanation consists in showing that the facts offered do not really indicate the conclusion suggested, i.e., the hostility. Thus, when the counter-evidence does not attempt to do this, but admits the hostility and desires to show that it was *justifiable by the opponent's conduct*, the offer is improper in two ways, first, because it does not at all explain away, but concedes that hostility exists, and, secondly, because it tends to prejudice unfairly the cause of the opponent by showing him to be an unjust man. For these reasons such evidence may be excluded.... [Footnotes omitted.]

3A J. Wigmore, Evidence, § 952 at 799–800 (Chadbourne rev. 1970).

**5.** Since we have reversed on this issue, we find it unnecessary to reach the other points which Bentley raises in this appeal. However, we do not want our failure to decide these other issues to be misunderstood. In particular, we are concerned about the admission of evidence that Bentley had a knife during a confrontation earlier in the evening. Bentley's possession of the knife and the description of the knife were admissible. However, we believe that Bentley's use of the knife in the confrontation presents a close question.