**Larry J. LAMONT, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–5998.

Court of Appeals of Alaska.

March 28, 1997.

John E. McConnaughy III, Assistant Public Defender, John B. Salemi, Public Defender, Anchorage, for Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

BRYNER, Chief Judge.

Larry J. Lamont was convicted, in separate trials stemming from unrelated incidents, of third-degree assault and two counts of second-degree sexual assault. He appeals his assault conviction, contending that the trial court erred in refusing to instruct the jury on his claim of self-defense. He appeals his sexual assault convictions, contending that the trial court abused its discretion in admitting evidence that he physically assaulted another woman in the past. We reverse both convictions.[1]

### Third–Degree Assault

Lamont was charged with third-degree assault for pointing a gun at Village Police Officer Lott Lott. During September 1994, Lamont lived in his mother's house in the village of Tuluksak. He operated a small store out of the house. At Lamont's trial, Officer Lott testified that during the early morning hours of September 10, he walked into the area of Lamont's mother's house because "[s]omeone told me that there was drinking" going on there. Lott was unarmed. According to Lott and other witnesses, an intoxicated Lamont approached Lott in the street, pulled out a gun, pointed it at Lott's chest, and threatened to "blow [Lott's] head off." Lamont eventually put the gun away and returned to his mother's house.

At his trial for the third-degree assault, Lamont conceded that he had in fact pointed a gun at Lott. The theory he hoped to present was that he acted in self-defense. La-

mont's version of events differed from that offered by Lott and other prosecution witnesses. Lamont claimed that he had been walking late at night in an area away from his mother's house when Lott approached him from behind and began to follow him. It was dark, and Lamont initially could not identify who it was behind him. He asked who it was, and attempted to warn the person off. However, he received no answer; the stranger "just stood there."

At some point, Lamont recognized that the other person was Lott. Lamont knew that Lott was a "pretty strong guy"—"I've seen his muscles, he works a lot." Lamont suspected that Lott had previously stolen money from him, and he became afraid that Lott planned to take his money again. Lamont was particularly nervous because he was carrying approximately one hundred dollars in cash from store proceeds; he was afraid that Lott was after that money. Lamont was also fearful because he knew that Lott had been in trouble with the law before and had spent some time in jail. Lamont was intoxicated and was concerned that he would be unable to defend himself if Lott tried to rob him. Lamont saw no other people in the area. To ward off a possible robbery, Lamont "spun around" and pulled out the gun—"just for a second"—in order to scare Lott away.

To support this defense, Lamont testified in his own behalf. Lamont specifically sought to testify about the money Lott allegedly stole from him in the past and about his knowledge that Lott had previously had problems with the law that had landed him in jail. Lamont also offered to call his brother as a witness to corroborate his claim of a prior theft. The trial court, however, issued a protective order prohibiting Lamont from introducing any evidence about Lott's prior theft or jail time. At the conclusion of the case, Lamont requested jury instructions on self-defense, use of deadly force, and robbery. The trial court denied the requested instructions, ruling that Lamont had present-

---

**1.** Lamont also appeals his sentence. Since we reverse Lamont's convictions, we need not ad-    dress the sentence appeal.

ed insufficient evidence to support a claim of self-defense.

On appeal, Lamont argues that the superior court erred in prohibiting him from presenting his claim of self-defense. We agree.

■■■ "[E]ven a weak or implausible self-defense claim is a question for the jury." *Folger v. State*, 648 P.2d 111, 113 (Alaska App.1982).

> It is well recognized that the burden is on the defendant to produce some evidence in support of a claim of self-defense before he will be entitled to a jury instruction. The burden to produce some evidence of self-defense is not, however, a heavy one; this standard is satisfied when self-defense has fairly been called into issue. In each case, the relevant inquiry is, "did the evidence viewed in the light most favorable to the defendant, generate the issue of self-defense for jury consideration?" A jury question will be presented and an instruction required if the evidence, when viewed in the light most favorable to the accused, might arguably lead a juror to entertain a reasonable doubt as to the defendant's guilt.

*Paul v. State*, 655 P.2d 772, 775 (Alaska App.1982) (footnotes and citations omitted).

■ The "some evidence" that must be presented to warrant the giving of a jury instruction on self-defense may consist solely of the uncorroborated testimony of the defendant himself. *Brown v. State*, 698 P.2d 671, 674 (Alaska App.1985). Once there is some evidence to support a claim of self-defense, the issue becomes one for the jury, not the court:

> Because it is apparent that a colorable claim of self-defense must be resolved by the jury, along with other factual issues relevant to the determination of innocence or guilt, the role played by the trial court in deciding whether a self-defense instruction is called for must be a limited one. The court must be mindful of the need to refrain from adjudicating factual issues that fall within the jury's domain. Application of too severe a standard in determining whether "some evidence" of self-defense has been presented will inevitably place the court in jeopardy of encroaching on the prerogative of the jury and, to that extent, impinging on the right of the accused to a jury trial.

*Paul*, 655 P.2d at 775–76.

Lamont would have been justified in using deadly force only to the extent that he "reasonably believe[d] the use of deadly force [was] necessary for self defense against death, serious physical injury, kidnapping, sexual assault in the first degree, sexual assault in the second degree, or robbery in any degree." AS 11.81.335(a)(2). Moreover, Lamont would not have been entitled to use deadly force if he knew that he could instead have retreated "with complete personal safety and with complete safety as to others." AS 11.81.335(b).[2]

■ The state correctly points out that in a case involving the alleged use of deadly force, the defendant must produce "some evidence tending to prove each element of [self] defense." *Ha v. State*, 892 P.2d 184, 190 (Alaska App.1995). The state contends that the trial court properly declined to instruct Lamont's jury on self-defense because Lamont failed to present "some evidence" that he reasonably believed himself to be in danger of robbery (or any of the other of-

**2.** Use of deadly force in self defense is defined in AS 11.81.335, which provides, in relevant part:

(a) Except as provided in (b) of this section, a person may use deadly force upon another person when and to the extent

(1) the use of nondeadly force is justified under AS 11.81.330; and

(2) the person reasonably believes the use of deadly force is necessary for self defense against death, serious physical injury, kidnapping, sexual assault in the first degree, sexual assault in the second degree, or robbery in any degree.

(b) A person may not use deadly force under this section if the person knows that, with complete personal safety and with complete safety as to others, the person can avoid the necessity of using deadly force by retreating[.]

Use of nondeadly force in self defense—a prerequisite for use of deadly force under AS 11.81.335(a)(1)—is permitted under AS 11.81.330(a), subject to certain exceptions not relevant here, when a "person reasonably believes it is necessary for self defense against what the person reasonably believes to be the use of unlawful force by the other[.]"

fenses enumerated in AS 11.81.335(a)(2)) or that he could not have retreated safely.

In arguing that Lamont failed to present some evidence that he reasonably believed a robbery to be imminent, the state points out the lack of evidence establishing that Lott ever actually intended to rob Lamont:

> Lamont testified at trial that Lott never touched Lamont, made a move to touch Lamont, or threatened Lamont with a weapon. Lamont also admitted that Lott never demanded money from him or tried to take anything from Lamont.

This is essentially the same reasoning used by the superior court in denying Lamont's requested instructions. The trial court found that

> by Mr. Lamont's own admission there wasn't a scintilla [of evidence] that Mr. Lott was taking or attempted to take any property from Mr. Lamont. There just was no robbery involved.... There was no attempt at anything. That's looking at the evidence most favorably to Mr. Lamont, not even considering the fact that the other witnesses said it was—Mr. Lott didn't come up behind Mr. Lamont but that Mr. Lamont came up to Mr. Lott. So even considering the evidence most favorable to Mr. Lamont there's no evidence whatsoever that Mr. Lott attempted or did anything to try to take anything from ... Mr. Lamont, so I'm going to go ahead and deny the request for three jury instructions.

However, the trial court's insistence on an objective showing that Lott actually attempted to rob Lamont fundamentally misconstrued the showing needed to warrant a self-defense instruction:

> When a homicide defendant asserts that he or she acted in self-defense, the law does not require the defendant to prove that he or she *actually* faced imminent deadly attack. Even if the defendant's fear turns out to have been mistaken, the

defense still may be established if the defendant proves that, under the circumstances, he or she reasonably feared imminent deadly attack at the hand of the victim.

*McCracken v. State,* 914 P.2d 893, 898 (Alaska App.1996).

The trial court thus appears to have applied an incorrect legal standard when it placed determinative significance on Lamont's failure to present evidence of actual threats, force, or attempted robbery.[3] The giving of jury instructions on self-defense has been required or upheld in situations where the defendant "did not know if [the victim] was armed with a weapon, although [he] did not see any weapons," *Folger,* 648 P.2d at 112, where the victim's actions were unaccompanied by any verbal threats, *Toomey v. State,* 581 P.2d 1124, 1125–26 (Alaska 1978) (four justices in agreement that self-defense instruction was necessary), and where the victim had merely "leaned forward as if to stand up" after making verbal threats and was shot to death in his seat. *McCracken,* 914 P.2d at 895. In *Houston v. State,* 602 P.2d 784 (Alaska 1979), the supreme court held that the defendant had introduced "substantial evidence of the merits of his self-defense theory" simply through his own testimony that he shot a stranger in a restroom "because he saw [the victim] make a movement for his pocket and feared 'he was goin' in his pocket or he was reachin' for somethin'.' " 602 P.2d at 788.

These cases illustrate that Lamont was not required to show that a robbery was actually imminent, but merely that he reasonably believed one to be imminent. Lamont specifically testified that he held this belief, and he described the circumstances that led him to do so. The reasonableness of Lamont's belief was a question for the jury, to be assessed by weighing Lamont's testimony against that of other witnesses. *Paul v. State,* 655 P.2d at 778. Having presented some "evidence in light of which a reasonable

---

3. Lamont's failure to claim that he believed Lott to be armed is not significant, since Lamont would have been entitled to use deadly force to protect himself against any form of robbery; Lott could have committed either a first- or second-

degree robbery of Lamont without using a deadly weapon. *See* AS 11.41.500(a)(3); AS 11.41.510. Thus, Lamont could reasonably have feared an imminent robbery, even if he knew that Lott was unarmed.

juror could have entertained a reasonable doubt" as to whether he reasonably believed that he faced an imminent threat of robbery, Lamont met his burden as to this element of the defense. *Folger,* 648 P.2d at 113 (quoting *LaLonde v. State,* 614 P.2d 808, 810 (Alaska 1980)).

■ The state further argues that Lamont failed to offer any evidence indicating that he could not have avoided the encounter by retreating to safety. According to the state, "[since] the evidence unambiguously showed that the encounter took place in the street, and that Lott had no weapon of any kind, there was no evidence that Lamont had no opportunity to retreat." This argument, however, mistakenly proceeds from a view of the evidence taken in the light most favorable to the state, not from the view most favorable to Lamont's claim of self-defense.

The state ignores Lamont's testimony that the encounter occurred in a dark area of the village, late at night, when Lamont believed that no other persons were present. The argument likewise ignores Lamont's testimony that he knew Lott to be a strong man and that Lamont believed himself to be too intoxicated to defend himself effectively without resorting to his gun. With respect to the safe retreat requirement set out in AS 11.81.335(b), the pertinent question is whether Lamont met his burden of presenting some evidence from which the jury could find a reasonable doubt as to whether Lamont knew that he could retreat with complete safety. Lamont's testimony readily met this burden.

In sum, the record establishes that Lamont presented some evidence supporting all necessary elements of his claim of self-defense. The trial court erred in refusing to instruct the jury on Lamont's claim of self-defense and in precluding Lamont from presenting evidence to support this claim. We must therefore reverse Lamont's conviction for third-degree assault.

### Second–Degree Sexual Assault

On September 27, 1994, sixteen-year-old R.A. and two other teenage girls went to the Lamont's house to shop at his store. The three girls accompanied Lamont to his bedroom, where Lamont offered them some whiskey. After Lamont and the three teenagers had been drinking for some time, R.A.'s companions departed, leaving R.A. alone with Lamont.

Upon leaving Lamont's house, R.A.'s two girlfriends encountered R.A.'s brother, Eric A., and R.A.'s boyfriend, George N.; the girls told Eric and George that R.A. was at Lamont's house and was drunk. Eric and George went to Lamont's house. There, they heard what sounded like a bed pounding up against the wall; they also heard R.A. saying "no" and "stop" in what sounded like a frightened voice. Eric went home to get his (and R.A.'s) parents.

Upon being told of R.A.'s situation, Eric and R.A.'s parents went to Lamont's house. R.A.'s mother, Gertrude A., went inside and asked for Lamont. Lamont's aunt led her down the hallway, and called for Lamont but got no response. After some time, a door swung open slightly; Gertrude A. pushed it open the rest of the way and saw her daughter inside, lying on the floor, "curled up like a little baby." Gertrude "kn[e]w [R.A.] ... wasn't ... in her right mind." She had to pick R.A. up by her arms to get her off the floor. R.A. was incapable of speech and "did not even know it was me there." Gertrude and Eric then "walked her all the way home." At home, R.A. told her mother that Lamont had raped her.

The state charged Lamont with two counts of sexual assault in the first degree for two separate acts of nonconsensual sexual intercourse that allegedly took place during the evening he was with R.A.[4] At trial, Lamont acknowledged that he had engaged in sexual penetration with R.A. but contended that the acts were consensual. As part of his theory of defense, he attempted to show that R.A. might have fabricated her claim of rape because she knew that her mother did not like Lamont and did not approve of her spending time with him.

---

4. The state also charged Lamont with three counts of furnishing alcohol to minors. Lamont did not contest the alcohol charges during his trial.

In developing this defense before the jury, Lamont's attorney asked R.A.'s mother, Gertrude A., on cross-examination, whether she "would much prefer [her] daughter going out with George N[.] than, let's say, Larry Lamont." Gertrude A. said "Yes." On redirect, the state asked Gertrude A., "Why don't you like Larry Lamont?" Lamont's attorney objected, arguing that this question called for an answer that was probably excludable under Evidence Rule 404(b). Upon inquiry by the court outside the jury's presence, R.A.'s mother disclosed the reason that she did not like Lamont:

> Being a health aide I know of what he did in the past to his girlfriend he had for close to eight months. He brutally abused her, and for my daughter R[.]'s safety I didn't want that to happen to her.
>
> . . .
>
> We used to see black and blue all over [the former girlfriend's] face and body.

The state maintained that Lamont's cross-examination had "opened the door" to this testimony. The state also argued that the testimony "is not being offered to show [Lamont's] propensity to commit the crime but it is being offered to prove his opportunity, his absence of mistake and his intent." The trial court agreed:

> First of all, the defense opened the door when [it] questioned Ms. A[.] regarding her preference for Mr. N[.] as being the boyfriend vis-a-vis Mr. Lamont. Secondly, this is admissible for other purposes aside from propensity; for opportunity, intent, absence of mistake or accident[.]

Over Lamont's objection R.A.'s mother was allowed to testify that she disliked Lamont because he had "brutally abused" his former girlfriend.

On appeal, Lamont claims that the trial court abused its discretion in admitting testimony concerning his prior assaultive conduct toward another woman. Lamont argues that neither of the trial court's reasons for allowing this testimony withstands scrutiny. Lamont's arguments have merit.

**5.** "[I]t is normally required that in order to be admissible on the issue of intent the prior misconduct of the accused must be similar to the crime charged and not too remote in time."

While evidence of a defendant's prior misconduct is admissible under Alaska Rule of Evidence 404(b)(1) to establish "opportunity, intent, . . . or absence of mistake or accident," none of these purposes had any realistic bearing on the issues in dispute in this case. Lamont did not claim mistake or accident; his past violence toward another woman had no relevance to show that he had an opportunity to sexually assault R.A.; and the complete lack of similarity between the past and present acts rendered the past acts inadmissible to show intent.[5] In the factual context of this case, the disputed evidence was not even colorably admissible to prove "opportunity, intent, . . . or absence of mistake or accident." A.R.E. 404(b)(1).

The trial court's other justification for admitting the disputed testimony was that Lamont had "opened the door" by questioning R.A.'s mother about her hostility toward Lamont. " 'Opening the door' to otherwise inadmissible evidence is often referred to as the doctrine of 'curative admissibility.' " *Bentley v. State*, 711 P.2d 544, 546 (Alaska App.1985). Although we did not label it as such, we applied this doctrine in *Leonard v. State*, 655 P.2d 766 (Alaska App.1982). Leonard agreed and then refused to take a polygraph test; at trial, he received a protective order excluding evidence of his refusal. In testifying on his own behalf, however, Leonard disclosed that he had agreed to take the polygraph test but did not mention his subsequent refusal. The state objected immediately and the judge excused the jury. After hearing arguments from both sides, the judge ruled that "the state will have the right, unless you bring it out, to explore the fact that a polygraph was offered and later refused." *Id.* at 768. We upheld the ruling, based on the theory behind the doctrine of curative admissibility. *Id.* at 771.

By contrast, we found the circumstances in *Bentley v. State* readily distinguishable. 711 P.2d at 545–46. There, the prosecution's primary witness was Pearson, a former girl-

*Fields v. State*, 629 P.2d 46, 51 (Alaska 1981) (quoting *Freeman v. State*, 486 P.2d 967, 977 (Alaska 1971)).

friend of Bentley. To establish Pearson's bias against Bentley, the defense brought out, on cross-examination, that the circumstances surrounding Pearson's breakup with Bentley had been acrimonious. The trial court concluded that this cross-examination opened the door for the state to inquire on redirect about the specific reasons for Pearson's hostility toward Bentley. *Id.* at 545. This inquiry elicited testimony concerning "Bentley's neglect of Pearson while she was pregnant with his child, including Bentley's failure to provide a decent home for her, and his continual drug use"; the inquiry further elicited testimony concerning the funeral of Pearson's baby, where Bentley "arrived in police custody and attempted only to seek out those who could help him get out of jail." *Id.*

In reversing the trial court's decision admitting this evidence of prior misconduct, we distinguised Bentley's case from *Leonard:*

> Unlike Leonard, Bentley did not present inadmissible evidence or mischaracterize a fact to the prejudice of the state. Bentley properly impeached Pearson for bias as permitted under Evidence Rule 613. Furthermore, Bentley's cross-examination was not misleading. Pearson, apparently, had actual bias and admitted as much. *See Gilliam v. State,* 270 Ind. 71, 383 N.E.2d 297, 301 (1978) (evidence relied upon to "open the door" must leave the trier of fact with false or misleading impression of facts presented).
>
> In addition, to the extent the cross-examination opened the door to a certain amount of explanation by the state, we find that far more than mere explanation was admitted here.

*Bentley,* 711 P.2d at 546 (footnote omitted).

Our decision in *Bentley* relied in part on *United States v. Winston,* 447 F.2d 1236 (D.C.Cir.1971), where the court wrote:

> "Opening the door is one thing. But what comes through the door is another. Ev-

erything cannot come through the door."
. . .

> "The doctrine of curative admissibility is one dangerously prone to overuse." Permission to explore in rebuttal with testimony not admissible on direct, on the ground that the other party has opened the doors, rests "upon the necessity of removing prejudice in the interest of fairness."
>
> The doctrine is to prevent prejudice and is not to be subverted into a rule for injection of prejudice. Introduction of otherwise inadmissible evidence under shield of this doctrine is permitted "only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence."

*Id.* at 1240 (citations and footnote omitted), *quoted in Bentley,* 711 P.2d at 546.

■ The situation in Lamont's case resembles the situation in *Bentley* rather than the situation in *Leonard.* Lamont's cross-examination of R.A.'s mother created no misleading impressions requiring further explanation. Lamont established that R.A.'s mother harbored a degree of hostility or bias toward him but did nothing to suggest that the hostility was baseless or unfounded. The state did not dispute the existence of this bias; rather, the evidence concerning the source of the bias confirmed its existence.

Under the circumstances, the source of Gertrude A.'s bias had no relevance.[6] Lamont's apparent purpose in establishing that R.A.'s mother disliked him was to suggest that R.A. might have been afraid to tell her mother that she engaged in consensual sex with Lamont and that R.A. thus had a motive to fabricate her report of sexual assault. Revealing the source of Gertrude A.'s hostility toward Lamont had no logical tendency to disprove R.A.'s potential desire to conceal her consent from her mother: regardless of the underlying reasons for the hostility, R.A. could have feared incurring her mother's wrath.[7]

---

6. We faced precisely the same situation in *Bentley:*

Such evidence in no way "cured" the shadow of bias cast upon Pearson. The effect of the evidence was only to show what good reasons

Pearson had to be biased and to discredit Bentley's character in front of the jury.
711 P.2d at 547.

7. Indeed, R.A.'s fear of incurring her mother's wrath might have increased if her mother's hos-

Thus, in no realistic sense did Lamont's cross-examination of Gertrude A. "open the door" to evidence of Lamont's prior misconduct; that Lamont had previously assaulted another woman simply had no probative value to any disputed issue in the case.

Nor can we readily dismiss the erroneous admission of this evidence as harmless. Error in the admission of evidence is harmless when "the evidence could not have substantially influenced the jury's verdict." *Stevens v. State,* 748 P.2d 771, 775 (Alaska App.1988). Lamont was acquitted of the two counts charging him with first-degree sexual assault and convicted of the two lesser offenses of second-degree sexual assault. These convictions required a finding that Lamont had engaged in sexual penetration with R.A., knowing that she was either "incapacitated" or "unaware that a sexual act [was] being committed." AS 11.41.420(a)(3)(B) & (C).

Lamont conceded that he engaged in sexual penetration with R.A. The state contends that "the evidence was overwhelming that R.A. was so intoxicated that she was temporarily incapacitated." The state argues that, under these circumstances, any "possible error" in admitting Gertrude A.'s testimony could not have had "an appreciable effect on the jury's verdicts that Lamont committed two second-degree sexual assaults on R.A."

But while evidence of R.A.'s after-the-fact incapacitation was indeed overwhelming, proof of her condition at the time of her sexual contact with Lamont was far less certain.

The two girls who accompanied R.A. to Lamont's house and drank alcohol with Lamont and R.A. both testified that R.A. was conscious when they left her alone with Lamont; neither witness provided any testimony suggesting that R.A.'s intoxication had progressed to or approached the point of incapacitation. R.A.'s brother and his companion claimed that, before they informed Gertrude A. of her daughter's presence at Lamont's house, they heard R.A.'s voice coming from Lamont's bedroom.[8] Gertrude A. herself testified to various delays that appear to have consumed at least an hour between when she first heard word of where her daughter was and when she finally found R.A. passed out in Lamont's room. And Lamont testified that he and R.A. continued drinking after they had sex.

Given these circumstances, we are unable to say that there was overwhelming proof of R.A.'s incapacitation at the time she engaged in sexual intercourse with Lamont, or of Lamont's knowledge of R.A.'s incapacity. We are likewise unable to say that the error in admitting evidence of Lamont's prior misconduct was unlikely to have affected the jury's verdict, particularly in light of the manner in which the prosecution used this evidence in final argument to the jury. In the opening segment of its final argument, the prosecutor stated that

> We also know that through what Gertrude said that there was a pattern to this assaultive type behavior. He had put himself on other women, he's forced himself on other women, he's assaulted other women.

On rebuttal, the prosecutor went on to describe Lamont as "this guy who has terrorized the village, terrorized women."

These arguments openly invited the jury to treat Gertrude A.'s testimony as evidence of

---

tility was well-founded and deep-seated rather than superficial.

**8.** Both of these witnesses claimed to have heard statements of R.A. indicating that she was being raped. It might be argued that the jury necessarily rejected this testimony in acquitting Lamont of first-degree sexual assault; along the same lines, it might also be argued that Lamont's convictions of the lesser offenses of second-degree sexual assault establish that his jury was not prejudiced by the prior misconduct evidence, since the potential prejudice of this evidence lay in its tendency to establish that Lamont was

violent toward women and thus probably raped R.A.—the crime of which Lamont was acquitted. However, reliance on this type of interpretation as a basis for finding harmless error would ignore the very danger that rendered the disputed prior misconduct evidence inadmissible in the first instance: the danger that this evidence might encourage a verdict reflecting emotional hostility rather than rational deliberation. Given the inflammatory nature of the prior misconduct evidence, it is impossible to say with any degree of confidence that the improper evidence did not induce a compromise verdict.

Lamont's propensity to commit violent crimes against women. Given the prosecution's emphasis on the prejudicial aspect of Lamont's prior misconduct, we must conclude that the erroneous admission of this evidence requires reversal of Lamont's second-degree sexual assault convictions.

Lamont's convictions for third-degree assault and second-degree sexual assault are accordingly REVERSED.