Tracy S. McCRACKEN, Appellant,

v.

STATE of Alaska, Appellee.

No. A–5427.

Court of Appeals of Alaska.

April 12, 1996.

Herman G. Walker, Assistant Public Defender, and John B. Salemi, Public Defender, Anchorage, for Appellant.

Cynthia L. Herren, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

*OPINION*

MANNHEIMER, Judge.

Tracy S. McCracken appeals his conviction for second-degree murder, AS 11.41.110(a). He contends that the superior court should have suppressed certain statements that he made to the police, and he also contends that the superior court should have allowed him to present more evidence concerning the victim's character for violence. We uphold the superior court's ruling concerning the admissibility of McCracken's statements to the police, but we agree with McCracken that he should have been allowed to present the evidence concerning the victim's character for violence. We therefore reverse McCracken's conviction.

McCracken and Brian Ritchie lived together in McCracken's home. McCracken, who is a paraplegic, provided Ritchie with room and board in exchange for Ritchie's cooking, cleaning, and general assistance with household tasks that McCracken found difficult or impossible because of his disability. The two men apparently got along well at first, but in October 1993 the relationship began to sour.

On October 23, 1993, Ritchie and McCracken got into a verbal altercation. Laura Miller (a friend of McCracken's) and her two children were temporarily staying at McCracken's house. By the early evening, the adults were upstairs drinking alcohol and the children were downstairs watching television. Ritchie and McCracken began to argue.

According to McCracken's trial testimony, Ritchie began to berate him, complaining that McCracken did not pay him enough and that McCracken did not appreciate him. Ritchie threatened to leave, and he began to call McCracken names. Other than telling Ritchie that he was free to leave, McCracken ignored Ritchie's words. Eventually, Ritchie left the room and went downstairs.

After Ritchie left the room, McCracken retrieved a handgun from the bedroom. He placed the gun next to his leg in his wheelchair, and then he wheeled himself back into the living room. A little later, Ritchie returned from downstairs and sat next to Miller on the loveseat in the living room. After sitting quietly for a few minutes, Ritchie again began shouting that he was going to leave. Miller attempted to calm Ritchie, but she was unsuccessful. Ritchie shouted at McCracken that he was "going to knock [him] out of that fucking wheelchair". Then Ritchie leaned forward as if to stand up. McCracken pulled out his gun and shot Ritchie while Ritchie was still on the loveseat. Ritchie died almost immediately.

Miller's children heard the gunshot, and they came upstairs. Both children saw McCracken put the handgun under his bathroom sink. In the meantime, Miller dialed 911 and reported that there had been a shooting. McCracken eventually got on the line; he told the 911 dispatcher that he had no knowledge of who shot Ritchie, and then he hung up on the dispatcher. When the dispatcher called back, McCracken hung up again.

Anchorage Police Officer Timothy McCulley responded to the 911 call. When he arrived, Miller and the two children were outside the house. McCulley entered the house and found Ritchie's body still on the loveseat; McCracken was also in the living room, sitting nearby in his wheelchair. McCulley asked McCracken what had happened, but McCracken did not respond. A few minutes later, Officer Douglas Pickerel arrived on the scene. When Pickerel asked McCracken what had happened, McCracken said only, "I was here, he was here."

Officer McCulley went back outside to talk with Miller and her children. Miller told McCulley that McCracken and Ritchie had argued for about twenty minutes, and then McCracken shot Ritchie. When McCulley radioed Pickerel that McCracken might be armed, Pickerel searched McCracken and his wheelchair, but he found nothing. At this point, the two children told McCulley that McCracken had put the gun under the bathroom sink.

Paramedics arrived at McCracken's house and attempted to revive Ritchie. Pickerel moved McCracken into the kitchen to give the paramedics more space in the living room. McCracken asked to be moved back to the living room, but Officer Pickerel refused to move him while the paramedics were working.

While they were in the kitchen, Pickerel asked McCracken how Ritchie had been shot. McCracken responded, "I don't know." Pickerel then asked McCracken what he had seen; McCracken responded that he "didn't see anything".

Another officer told Pickerel to remain in the kitchen with McCracken. When McCracken attempted to leave the kitchen area, Pickerel ordered him to stay in the kitchen and wait for the detectives to come question him. When the detectives arrived, they handcuffed McCracken and placed him under arrest.

After being placed under arrest, McCracken was transported to the police station, where Detective Greg Baker attempted to interview McCracken. Baker began by asking McCracken preliminary questions such as his name and date of birth. Baker then asked McCracken how intoxicated he was, to which McCracken responded, "Very little." The conversation then continued:

BAKER: Okay. Now what I'd like to do is, I'm kind of tryin' to investigate this situation that happened over there at Foraker.

McCRACKEN: Yep.

BAKER: And what I'd like to do is, I'd like to find out what your side of the story is on this, so you can tell me. However, because you're under arrest, I want to read you these *Miranda* rights. Have you ever heard of those before?

McCRACKEN: Oh, Christ.

BAKER: Well, you know, everybody's got a job to do. You understand where I'm coming from, don't you?

McCRACKEN: Yeah.

BAKER: Now, I want you to listen, and if you have any question, I want you to, you know, to ask it.

McCRACKEN: Well, I ain't gonna answer anything.

BAKER: You're not going to answer any questions at all?

McCRACKEN: No, none at all.... It's my house, I ain't gonna be put in any ... position[.] ... The man lived with me and ... he took good care of me, but nobody—Shit comes down to shit. And that's it.

Baker made no further inquiry into the shooting, although he did ask McCracken if he had been treated well and if he wanted anything to drink. McCracken said that he had been treated well, and he asked for a cigarette. Baker then explained that the police would be transporting McCracken to the courthouse for an arraignment before a magistrate.

Before trial, McCracken asked the superior court to suppress all the statements that McCracken made to the police from the time the officers arrived at his house. Superior Court Judge Karl S. Johnstone ruled that, even though Officer Pickerel wheeled McCracken into the kitchen, and even though Pickerel refused McCracken's request to return to the living room, McCracken was not in custody at that time. Judge Johnstone stated:

> The refusal to let Mr. McCracken move about, or smoke cigarettes, or go back into the [living] room ... was to preserve the crime scene. A reasonable person would not have felt that they were in custody under the circumstances. [The] officers had an obligation to make sure that there was nobody else in there. There was a gun that was involved, and they had a duty to protect themselves and others by ascertaining who might be in the premises behind the door, things of that nature. That's all necessary for security, and [the] defendant was in his own home. [There is] no evidence of a significant show of force that would lead a reasonable person to believe that Mr. McCracken was in custody under a *Hunter* analysis[.]

*See Hunter v. State,* 590 P.2d 888, 895 (Alaska 1979) (adopting an objective test for determining custody for purposes of *Miranda*

*v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

However, Judge Johnstone ruled that McCracken had been in custody for *Miranda* purposes from the time Officer Pickerel told him that he would have to stay in the kitchen to await the arrival of the homicide detectives. At that juncture, Judge Johnstone found, "it appears ... [that the police were] not going to let [McCracken] go anywhere—and not just ... to protect the crime scene, but to *de facto* place him in custody."

Despite his ruling that McCracken was placed in custody while he was still at the house, Judge Johnstone upheld the admissibility of McCracken's statement to Baker at the police station ("It's my house, I ain't gonna be put in any ... position[.] The man lived with me and ... he took good care of me, but nobody—Shit comes down to shit. And that's it.") Judge Johnstone found that this statement was not the result of interrogation, but was instead volunteered by McCracken. *See Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Beagel v. State,* 813 P.2d 699, 705 (Alaska App.1991) (the *Miranda* suppression rule applies only to statements that are the product of interrogation, not volunteered statements).

▮▮▮ On appeal, McCracken asserts that the superior court should have suppressed all of his statements from the time the police arrived at his house. He contends that at least some of the officers suspected him from the beginning and were keeping an eye on him. However, Judge Johnstone credited the police testimony that McCracken was moved to the kitchen to protect the crime scene and to allow the paramedics room to work. This finding is not clearly erroneous. Given this finding, we agree with Judge Johnstone that a reasonable person in McCracken's circumstances would not have felt himself to be in custody when he was told to stay out of the living room. We also note that the early police questions to McCracken appear to have been the kind of "general on-the-scene questioning as to facts surrounding a crime" that does not qualify as "interrogation" for *Miranda* purposes. *Beagel,* 813

P.2d at 705 (quoting *State v. Salit,* 613 P.2d 245, 257 (Alaska 1980)).

McCracken also contends that the superior court should have suppressed the statement he made to Officer Baker after he was taken to the police station. In the trial court, McCracken argued that his statement to Baker should be suppressed because he was in custody, he never received *Miranda* warnings, and the statement was made in response to interrogation. (McCracken argued that Baker's question, "You're not going to answer any questions at all?", constituted interrogation for *Miranda* purposes.) As noted above, Judge Johnstone agreed that McCracken had been in custody and had not received *Miranda* warnings, but he found that McCracken's statement was volunteered.

■ On appeal, McCracken has abandoned his *Miranda* argument and advances two different contentions.[1] First, he asserts that admission of his statement violated *Gunnerud v. State,* 611 P.2d 69, 75–76 (Alaska 1980), and *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), because the statement informed the jury that McCracken had exercised his right to remain silent. This would have been be true if the jury had heard Officer Baker's question, "You're not going to answer any questions at all?", but the jury heard only McCracken's answer. Thus, McCracken's statement, "No, none at all" did not convey an invocation of his right to remain silent.

■ Second, McCracken asserts that the rest of his statement to Baker should be suppressed because McCracken made the remainder of the statement after he had invoked his right to silence (by telling Baker, "No, none at all"). This contention is answered by Judge Johnstone's finding that the remainder of McCracken's statement was volunteered. McCracken uttered the remainder of the statement immediately after he said that he would answer no questions. There was no intervening question put by Baker; McCracken simply continued speaking.

1. McCracken returns to the *Miranda* argument in his reply brief, but arguments raised for the first time in a reply brief are waived. *See* Alaska

For these reasons, we uphold Judge Johnstone's rulings concerning the admissibility of McCracken's statements to the police. We now turn to the superior court's rulings on evidence of Ritchie's propensity for violence.

After McCracken took the stand and testified that he shot Ritchie because he feared that Ritchie was about to attack him, Judge Johnstone ruled that McCracken would be allowed to introduce evidence of Ritchie's character for violence; the judge ruled that this evidence was relevant because it tended to establish that Ritchie had been the first aggressor in the conflict.

The remaining question, as Judge Johnstone phrased it, was whether McCracken would "be able to go beyond opinion and reputation" evidence—whether McCracken was entitled to introduce evidence of specific instances in which Ritchie had acted violent. McCracken's attorney told Judge Johnstone that McCracken wished to testify concerning (1) Ritchie's acts of violence that he had personally observed, as well as (2) Ritchie's acts of violence that Ritchie had told him about, and (3) Ritchie's acts of violence that other people had told him about. The prosecutor responded that she did not object to McCracken's testifying about incidents he had personally observed, but she objected to McCracken's testifying about what Ritchie or other people had told him.

Judge Johnstone adopted the prosecutor's position. He ruled:

I'll permit Mr. McCracken to testify about the observations of Brian Ritchie's drinking and any observations he had of Mr. Ritchie's violence in his presence. I'll let Mr. McCracken testify ... about the reputation for violence that Mr. Ritchie may have. I will not allow him to testify to the hearsay comments made by Mr. Ritchie. I find that that has the capacity to confuse the real issues and consume unnecessary time in this case. It's unduly prejudicial, its probative value is outweighed by those factors, and I note [that

Appellate Rule 212(c)(3); *Petersen v. Mutual Life Ins. Co. of New York,* 803 P.2d 406, 411 (Alaska 1990).

although] the case law in general provides for admissibility of opinion and reputation evidence for violence to show who was the first aggressor, it's generally very limited in allowing specific acts unless they go to the real issue here; and in this court's opinion, they do not. To the extent they go to any issue in this case, the presentation of that evidence is outweighed by the unnecessary consumption of time [and] it's outweighed by all the factors that prohibit admissibility under 403. So specific acts at this time from this witness concerning what Mr. Ritchie told him are not admissible.

This ruling was in error.

When a homicide defendant raises the defense of self-defense, evidence concerning the victim's character for violence is potentially admissible for two reasons. First, it may tend to demonstrate who was the initial aggressor in the confrontation. Second, it may tend to demonstrate that the defendant's fear of imminent deadly force at the victim's hand was reasonable. *Amarok v. State*, 671 P.2d 882, 883–84 (Alaska App.1983).

■ When evidence of the victim's character for violence is introduced for the first purpose (to show who was the initial aggressor), the evidence is introduced for the very purpose normally barred by the evidence rules: to prove that the victim acted in conformity with his or her trait for violence. As *Amarok* notes, 671 P.2d at 883–84, when evidence of the victim's character is used in this way, "[the] defendant's [prior] knowledge of the [victim's character] is immaterial" because the purpose of the evidence is to circumstantially prove a question of historical fact: was the victim the initial aggressor during the encounter between the defendant and the victim?

■ On the other hand, when evidence of the victim's character for violence is introduced for the second purpose (to prove the reasonableness of the defendant's fear of imminent deadly attack), it is not being used as "character evidence" in the usual sense. Although evidence of a victim's reputation for violence or a victim's past acts of violence may, indeed, tend to show that the victim had

a violent character, the primary relevance of the evidence is not to prove the victim's violent character, nor to prove that the victim acted in conformity with a violent character at the time of the incident in question. Rather, the primary relevance of this evidence is to prove the defendant's state of mind when he or she used deadly force against the victim—in particular, the reasonableness of the defendant's fear that the victim was about to attack with deadly force.

■ When a homicide defendant asserts that he or she acted in self-defense, the law does not require the defendant to prove that he or she *actually* faced imminent deadly attack. Even if the defendant's fear turns out to have been mistaken, the defense still may be established if the defendant proves that, under the circumstances, he or she reasonably feared imminent deadly attack at the hand of the victim. AS 11.81.330–340; *Weston v. State*, 682 P.2d 1119, 1121 (Alaska 1984). When the trier of fact evaluates the reasonableness of the defendant's belief that it was necessary to attack the victim with deadly force, one relevant circumstance is the defendant's knowledge of, or reasonable belief concerning, the victim's propensity for violence.

■ When evidence of the victim's character for violence is introduced for this purpose (to prove the defendant's knowledge or belief), then obviously "[the] defendant must know of the victim's past acts of violence". *Amarok*, 671 P.2d at 884. But this does not mean that the defendant is limited to acts of violence that he or she personally observed. Because the underlying issue is the reasonableness of the defendant's fear of the victim, all evidence tending to reveal the defendant's state of mind is relevant. The defendant might reasonably have come to fear the victim if the defendant heard other people voice an opinion concerning the victim's propensity for violence, or if the defendant heard other people relate past instances in which the victim acted violent, or if the defendant heard the victim himself relate his past violent escapades. *See* J.H. Wigmore, *Evidence in Trials at Common Law* (Chadbourn rev'n, 1979), § 248, Vol. 2, pp. 66–68.

When, for this purpose, a defendant offers evidence that he or she had previously heard other people speak of the victim's violent acts, this evidence is not "hearsay"; its relevance is not the truth of the matters asserted, but rather the effect of these utterances upon the hearer (the defendant). As *Wigmore* explains, "the real purpose [of this evidence] is merely to show such conduct as would naturally excite apprehension [on the part of the defendant], whether it objectively indicates a fixed trait of [the victim's] character or not." *Id.,* p. 71.

■ In the present case, there was essentially no dispute concerning the events that led up to the shooting. Rather, the prosecution's case focused on the contention that McCracken either had over-reacted to Ritchie's blustering or had used this verbal altercation as an excuse to murder Ritchie. McCracken's trial presented no "first aggressor" issue. It was undisputed that Ritchie began to rise from his seat and that McCracken shot him before he could get to his feet. Instead, the disputed issues at McCracken's trial were (1) whether McCracken subjectively believed that it was necessary to shoot Ritchie to avoid imminent death or serious physical injury at Ritchie's hand, and (2) whether this belief was reasonable.

Evidence that Ritchie had previously told McCracken about Ritchie's own past acts of violence, and evidence that other people had previously told McCracken about Ritchie's violent propensities, was just as relevant to the reasonableness of McCracken's fear as incidents of Ritchie's violent behavior that McCracken had personally observed. The superior court was wrong to reject such evidence as "hearsay".

■ The superior court was empowered to place reasonable limitations on McCracken's presentation of evidence on this point. A parade of witnesses all asserting that the victim was a violent or vicious person might well lead the jurors to reach the conclusion that the victim was unworthy of the law's protection, persuading them to base their verdict on emotion rather than the law. And some of the offered testimony may have had little probative value, either because the incident described was too remote or because it was only tangentially related to Ritchie's asserted propensity for life-threatening violence. But McCracken was entitled to present evidence of what he had heard of Ritchie's past acts of serious violence, as well as his reputation for serious violence, so that the jury could fairly appraise McCracken's claim that he reasonably feared imminent death or serious physical injury when he shot Ritchie. *See Gottschalk v. State,* 881 P.2d 1139, 1144–45 (Alaska App.1994).

Judge Johnstone allowed McCracken to present various witnesses who testified to Ritchie's reputation for violence, and one witness (Joseph Kastrava) who testified that he had observed Ritchie commit specific acts of violence. However, because there was no "first aggressor" issue, the fact that Ritchie had a reputation for violence or had committed past acts of violence was, by itself, irrelevant. The pertinent issues were (1) whether McCracken knew of Ritchie's reputation and Ritchie's past acts of violence, and (2) what McCracken could reasonably conclude from this knowledge. Judge Johnstone excluded most of the evidence that McCracken offered on these issues; more importantly, the excluded evidence was McCracken's most forceful evidence on these issues.

Because the superior court's erroneous exclusion of evidence substantially limited McCracken's ability to establish the basis for his belief that Ritchie was about to attack him with deadly force, we hold that McCracken is entitled to a new trial. The judgement of the superior court is REVERSED.