Johnny B. JOHNSON, Appellant,

v.

STATE of Alaska, Appellee.

No. A–10243.

Court of Appeals of Alaska.

Jan. 20, 2012.

Brooke V. Berens, Assistant Public Advocate, and Rachel Levitt, Public Advocate, Anchorage, for the Appellant.

Ann B. Black, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and John J. Burns, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

BOLGER, Judge.

Johnny B. Johnson was charged with three counts of attempted first-degree murder and three counts of first-degree assault, for cutting three individuals with a box cutter. At trial, Johnson claimed self-defense against all three victims. The court did not allow Johnson to introduce evidence of one victim's statement that he had attacked a neighbor the night before and did not allow Johnson to argue self-defense as to one of the other two victims. We conclude that the court should have allowed Johnson to introduce this statement and should have instructed the jury on Johnson's right of self-defense as to all three victims.

The court also allowed the State to introduce a photograph of Johnson's tattoos that was taken in a jail cell and allegedly showed a Confederate flag tattoo on Johnson's chest. We conclude that the court abused its discretion when it admitted the photograph of this tattoo. We reverse the judgment of conviction and remand for a new trial.

### Background

Larry Moulder was released from an Anchorage jail around 5:30 a.m. on June 11, 2006. Moulder had been arrested the previous evening for drunk and disorderly conduct after he threatened a neighbor who cut the water hose attached to his pressure washer. Moulder was walking home from the jail when he saw a man—Johnny Johnson—asleep in his truck in a parking lot. Moulder

approached Johnson, and Johnson agreed to give him a ride home. Moulder drank a beer in the truck.

When Moulder and Johnson arrived at Moulder's apartment, his roommate, Jim White, answered the door. Then White went back to sleep, and Moulder woke up another friend, Conrad Nordeen, who was asleep in one of the bedrooms. Nordeen and Johnson talked while Moulder left briefly to retrieve his wallet and keys, which he had left with a neighbor when he was arrested.

When Moulder returned, Johnson was talking about his time in prison and his prison tattoos. Johnson showed Nordeen his tattoos. Moulder told Johnson that he previously served time for raping a fifteen-year-old girl. While they were talking, White was on the couch and occasionally moaned and asked the other men to be quiet.

Moulder testified that he left the living room to go to the bathroom. When Moulder left the bathroom, Johnson jumped on Moulder and started cutting him with a utility knife. Johnson slit Moulder's throat, fractured his skull, and cut his hand. Nordeen heard the scuffle and got up to see what was going on, but Johnson cut him on his cheek and lip. Moulder and Nordeen were able to escape into the bathroom and blocked Johnson from entering the bathroom.

While Johnson was pounding on the door, Moulder and Nordeen were able to escape from a second door that led to the bedroom. As the men were running out of the apartment, Nordeen yelled to White to leave and "save himself." Nordeen and Moulder ran upstairs to a neighbor's house and the neighbor called for help. Johnson also cut White with the utility knife, then ran from the apartment and sped off in his truck. White passed away from natural causes before the trial.

Johnson's description of this incident differed from that of Moulder and Nordeen. Johnson testified that, after Moulder left to retrieve his keys, Nordeen asked him at least twice whether he ever had sex in prison with a man. Johnson testified that, during that time, Nordeen began tracing the tattoos with his fingers, and Johnson asked Nordeen to stop touching him. According to Johnson, he decided to use the restroom before leaving the apartment and Moulder showed Johnson to the bathroom. Before Johnson entered the bathroom, Moulder grabbed Johnson's crotch. Johnson attempted to resist Moulder, but Nordeen grabbed Johnson from behind and held him in a choke hold. Johnson saw a stick (possibly a pool cue) come down on his head and "[e]verything went white."

Johnson testified that he was scared of being severely beaten, killed, or raped. Then he remembered that he had a utility knife in his pocket. When Johnson pulled out the knife, White yelled "he's got a knife, he's got a box cutter." Johnson then began slashing with the knife. Johnson testified that he cut Moulder's hand and punched him in the neck. Johnson also dug his knife into the back of Moulder's head. Johnson then started jabbing his knife at Nordeen's face and ultimately escaped from Nordeen's hold.

Johnson testified that, when he tried to run out of the apartment, White was in the doorway, blocking his way. Johnson slashed at White and scratched his neck and chest. Johnson testified that he cut White because he thought White was going to stop him from leaving.

After Johnson drove away, he went to a trailer where he had been staying. Once there, Johnson tried to burn his shirt in a barbeque and washed off the blood with bleach. Johnson also talked to his friend, Ryan Ducker. After Ducker asked why his shirt was burning, Johnson began to tell him about the incident at Moulder's apartment. Johnson indicated that there were three men involved and that he slit their throats. Johnson told Ducker that he became angry after Moulder admitted that he had raped a fifteen-year-old girl.

The jury convicted Johnson of three counts of attempted first-degree murder and tampering with evidence. The jury also found Johnson guilty of first-degree assault of Moulder and Nordeen, but convicted Johnson of the lesser-included offense of third-degree assault for Johnson's assault of White. Johnson now appeals.

## Discussion

*The evidence that Moulder had attacked his neighbor was admissible to show whether Johnson's use of force was reasonable.*

Outside the presence of the jury, Johnson made an offer of proof about Moulder's statements after Johnson first picked him up. Johnson testified that, on the way to Moulder's home, Moulder told him that his neighbor cut his water hose the night before. According to Johnson, Moulder said that he had been drinking, that he attacked his neighbor, and that he refused to stop after the police arrived. Johnson's attorney asked to introduce Moulder's statements to Johnson, but the court denied his request.

The following day, Johnson again asked the court to allow him to testify about Moulder's statements. The court reiterated that it did not believe there was sufficient information to justify the level of force. The court explained that "the reason that specific acts come in [is] for a justification of the level of force" and that "[t]here's nothing about the incident as [Johnson] reported to [the court] that's sufficient for that."

Johnson argues on appeal that evidence of his knowledge of Moulder's specific acts of violence are admissible to show that he "acted reasonably in using the degree of force he did." [1] Johnson claims that the evidence of Moulder's assault on his neighbor was necessary to "show the reasonableness of Mr. Johnson's belief that force was necessary to protect himself from sexual assault, serious physical injury, or even death."

The State argues that Alaska Evidence Rules 404(a)(2) and 405 allow only reputation and opinion evidence to prove the character of the victim in criminal cases involving claims of self-defense. The State argues that the trial court placed a reasonable limitation on admitting the evidence when it concluded that the argument with the neighbor did not go to the reasonableness of Johnson's use of deadly force.

Evidence Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible if the sole purpose for offering the evidence is to prove the character of a person in order to show that the person acted in conformity therewith." [2] However, evidence of other crimes, wrongs, or acts is "admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." [3] A trial court's decision on whether to admit evidence of prior misconduct is reviewed for abuse of discretion. [4]

In *McCracken v. State*, we analyzed whether a defendant asserting self-defense could introduce specific instances of conduct to show that they had a reasonable belief about the victim's propensity for violence. [5] We noted that evidence of the victim's character for violence is potentially admissible when "it may tend to demonstrate that the defendant's fear of imminent deadly force at the victim's hand was reasonable." [6] In this situation, a defendant may be entitled to present evidence of what "he had heard of [the victim's] past acts of serious violence, as well as his reputation for serious violence, so that the jury could fairly appraise [the defendant's] claim that he reasonably feared imminent death or serious physical injury." [7] A defendant is not limited to showing only acts of violence that they personally observed: "Because the underlying issue is the reasonableness of the defendant's fear of the victim, *all evidence* tending to reveal the defendant's state of mind is relevant." [8]

In *Allen v. State*, we further explained how evidence of specific acts of violence by the victim may be admitted to prove

1. *Allen v. State*, 945 P.2d 1233, 1241 (Alaska App.1997).

2. Alaska Evid. R. 404(b)(1).

3. *Id.*

4. *Morrell v. State*, 216 P.3d 574, 579 (Alaska App.2009).

5. 914 P.2d 893, 898 (Alaska App.1996).

6. *Id.*

7. *Id.* at 899.

8. *Id.* at 898 (emphasis added).

the reasonableness of the defendant's state of mind:

> When a defendant is aware of the victim's past acts of violence, and evidence of those acts of violence is offered to prove the reasonableness of the defendant's use of defensive force, ... evidence of the victim's specific acts is not barred by Evidence Rule 405—because the evidence is not being used as "character evidence" of the type governed by Evidence Rules 404(a) and 405.[9]

In this case, we conclude that the trial court erred in excluding the evidence of Moulder's statements to Johnson. First, it appears that Johnson was trying to introduce evidence of Moulder's statements to show the effect of these statements on Johnson's state of mind and the reasonableness of his use of force. It does not matter for this purpose whether Moulder actually committed the acts of violence that he described to Johnson. The point is that Moulder told Johnson that he had done these things.[10] Johnson offered the evidence to show the reasonableness of his use of defensive force. This evidence was not barred by Evidence Rule 405 "because the evidence [was] not being used as 'character evidence' of the type governed by Evidence Rules 404(a) and 405."[11]

██ The trial court excluded Johnson's statements about his state of mind because the court did not believe there was sufficient justification for the level of force. But, as noted in *McCracken,* "all evidence tending to reveal the defendant's state of mind is relevant."[12] The court is entitled to place "reasonable limitations on ... [the] presentation of evidence."[13] But Johnson's evidence did not involve a "parade of witnesses" or other excessive evidence that could have led the jury to "reach the conclusion that the victim was unworthy of the law's protection" or would have persuaded the jury to "base their verdict on emotion rather than the law."[14] It appears from the offered testimony that Johnson would have testified only briefly about Moulder's statements. Like the defendant in *McCracken,* Johnson was "entitled to present evidence of what he had heard of [the victim's] past acts of serious violence, as well as his reputation for serious violence, so that the jury could fairly appraise [his] claim that he reasonably feared imminent death or serious physical injury."[15]

We conclude that the erroneous exclusion of this evidence substantially limited Johnson's ability to establish the basis for his belief that Moulder was about to attack him with deadly force or cause him serious physical injury. Johnson is entitled to a new trial.[16]

*The admission of a photograph of Johnson's tattoos was an abuse of discretion.*

██ Just before the trial began, the court ordered Johnson to allow the State to photograph the tattoos on his chest. When the photograph was later introduced, Johnson objected. The photograph showed the tattoos on Johnson's upper body. Johnson initially only challenged the photograph on the basis that it showed Johnson was in a prison cell, but the court found that the background in the photo was not clearly a prison cell: it could have been "any locker room in any public gym in Anchorage."

Later, when the State was examining the officer that photographed Johnson's tattoos, Johnson again objected to the admission of the photograph. Johnson's attorney argued that Johnson's tattoos included a Confederate flag. Since there was an African American member of the jury, Johnson argued that the juror might believe Johnson was racist. Johnson therefore requested that, if the

9.   945 P.2d at 1241.

10.   *See id.*

11.   *Id.*

12.   *McCracken,* 914 P.2d at 898.

13.   *Id.* at 899.

14.   *Id.*

15.   *Id.*

16.   *See id.* ("Because the superior court's erroneous exclusion of evidence substantially limited McCracken's ability to establish the basis for his belief that [the victim] was about to attack him with deadly force, we hold that McCracken is entitled to a new trial.").

court decided to introduce the photograph, the court blur out the image of the Confederate flag.

The court, however, overruled the objection since it was not "sure anybody would recognize a portion of the tattoo as a Confederate flag." The court noted that the tattoo was similar to the Confederate flag, but in the middle of the rectangle was the head of an eagle.

Johnson argues on appeal that the court's decision to admit the photograph of Johnson's tattoos was prejudicial for two reasons: (1) the tattoo included a depiction of the Confederate flag and (2) the photograph was taken in a prison cell and showed that Johnson was in custody during the trial. Johnson claims the photograph had little in the way of probative value since Nordeen did not recall what the tattoos looked like and could only recall their general location.

The State argues that the photograph was relevant to corroborate the testimony of Moulder and Nordeen. The photograph showed the location of the tattoos and placed the interactions regarding the tattoos in context for the jury.

Alaska Evidence Rule 403 indicates that, "[a]lthough relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The phrase "unfair prejudice" refers to evidence that has the "undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one."[17]

■ Johnson first argues that the photograph shows that he was in custody during the course of the trial. In Alaska, defendants and witnesses may not be treated "in a manner that would identify them 'as someone in custody to the jury, thus undermining the presumption of innocence and prejudicially affecting the defendant's right to jury trial.' "[18] But Judge Volland found that it was not readily apparent that there was a jail cell in the background of the photo. This finding does not appear to be clearly erroneous. There are no bars visible, and it is unclear whether the background is a jail cell or merely a public gym or another public facility.

Johnson's second challenge to the admission of the photograph is related to the purported depiction of the Confederate flag on Johnson's chest. As noted above, Judge Volland based his conclusion for the Rule 403 prejudice prong on his finding that he was not "sure anybody would recognize a portion of the tattoo as a Confederate flag." Since the court did not believe that anyone would recognize the tattoo as containing a Confederate flag, the court concluded that the image did not present a risk of prejudicing Johnson.

It appears to us that it was erroneous for the judge to say that there is no likelihood of any juror recognizing that the tattoo included an image of the Confederate flag. Even with the eagle in the center of the tattoo, the flag still closely resembles a Confederate flag. Thus there appears to be a risk of prejudice from showing the jury that Johnson had a Confederate flag tattoo.

Other courts have recognized the risk of prejudice from indicating a defendant has a tattoo or another display of the Confederate flag. For example, in *United States v. Blanding,* the Fourth Circuit Court of Appeals discussed this negative perception:

It is the sincerely held view of many Americans, of all races, that the confederate flag is a symbol of racial separation and oppression. And, unfortunately, as uncomfortable as it is to admit, there are still those today who affirm allegiance to the confederate flag precisely because, for them, that flag is identified with racial

---

**17.** Alaska Evid. R. 403 cmt. paras. 1, 5 ("These circumstances [for excluding relevant evidence] entail risks which range all the way from inducing [a] decision on a purely emotional basis, at one extreme, to nothing more harmful than merely wasting time, at the other extreme. Situations in this area call for balancing the probative value of and need for the evidence against the harm likely to result from its admission.").

**18.** *Earl v. State,* Mem. Op. & J. No. 4555, 2002 WL 531097, at *6 (Alaska App. Apr. 10, 2002).

separation. Because there are citizens who not only continue to hold separatist views, but who revere the confederate flag precisely for its symbolism of those views, it is not an irrational inference that one who displays the confederate flag *may* harbor racial bias against African–Americans.[19]

Given the potential prejudice from showing the jury the defendant's Confederate flag tattoo, we must examine whether this risk of prejudice outweighs the probative value of admitting the photograph.

We conclude that the probative value of the photograph was minimal relative to the potential prejudice to the defendant from admitting the photograph. Prior testimony had indicated the general location of the tattoo and the identity of Johnson was not at issue in the case. Johnson himself acknowledged that he cut the victims. There was little need for the jury to understand the exact meaning or appearance of a prison tattoo given the lack of any particular relevance to an issue in the case. Because the potential for prejudice outweighs the minimal probative value of the photograph, the superior court abused its discretion in admitting the photograph. On retrial, this evidence should not be admitted.

*Johnson was entitled to a jury instruction on whether he acted in self-defense against White.*

▅▅▅ Johnson asked the court to allow him to present a self-defense argument for the charges related to White. Johnson had testified that White was standing in the doorway when he was trying to leave the apartment. He testified that White appeared to be helping Nordeen and Moulder when White yelled that Johnson had a knife. Johnson claimed he was afraid White was

going to stop him from leaving the apartment by standing in his way.

The court denied Johnson's request for a self-defense instruction regarding Johnson's attack on White. The court provided self-defense instructions as to Johnson's actions against Moulder and Nordeen.

▅▅▅ To show self-defense, "a defendant must satisfy both an objective and subjective standard; he must have actually believed deadly force was necessary to protect himself, and his belief must be one that a reasonable person would have held under the circumstances."[20] The reasonableness of a defendant's belief is a question for the jury, "to be assessed by weighing [a defendant's] testimony against that of other witnesses."[21] The trial court must instruct the jury on self-defense when the record contains "some evidence" which places the defense in issue.[22] Under the "some evidence" standard, a "self-defense instruction must be given if there is evidence from which a reasonable juror could entertain a reasonable doubt as to the defendant's guilt."[23] In applying this test, "neither the credibility of conflicting witnesses nor the plausibility of the accused's version is considered."[24] In other words, "even a weak or implausible self-defense claim is a question for the jury."[25]

In this case, Johnson's testimony concerning the circumstances of the altercation and his fear that White would attack him or prevent him from leaving presented sufficient evidence to justify a self-defense instruction. The ultimate reasonableness of Johnson's claim was a question for the jury. Based on Johnson's testimony, a reasonable juror could conclude that Johnson reasonably believed that White was acting in concert with Moulder and Nordeen. If Johnson presents the same evidence on retrial, then he is entitled to an instruction requiring the

19. 250 F.3d 858, 861 (4th Cir.2001).

20. *Weston v. State*, 682 P.2d 1119, 1121 (Alaska 1984).

21. *Lamont v. State*, 934 P.2d 774, 777 (Alaska App.1997).

22. *Weston*, 682 P.2d at 1121 (quoting AS 11.81.900(b)(15)(A)).

23. *Id.*

24. *LaPierre v. State*, 734 P.2d 997, 1000 (Alaska App.1987).

25. *Lamont*, 934 P.2d at 777 (quoting *Folger v. State*, 648 P.2d 111, 113 (Alaska App.1982)).

jury to determine whether he acted in self-defense when he attacked White.

### Conclusion

The trial court erred in denying Johnson's request to admit evidence of Moulder's statements about his attack on his neighbor to show Johnson's state of mind. The trial court also abused its discretion in admitting the photograph of Johnson's tattoo. Finally, the court erred in not providing a self-defense instruction for the counts related to White since Johnson presented "some evidence" that he acted in self-defense. We therefore REVERSE the judgment of conviction.

We cannot tell whether the errors referenced above had an appreciable effect on Johnson's conviction for tampering with evidence. Neither party has briefed this issue on appeal. On remand the superior court shall make this determination. If any of these errors had an appreciable effect on the tampering charge, then Johnson is entitled to a new trial on this charge.