NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

MARQUINN JONES-NELSON,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-11966
Trial Court No. 3AN-11-05289 CR

O P I N I O N

No. 2650 — July 19, 2019

Appeal from the Superior Court, Third Judicial District, Anchorage, Gregory A. Miller, Judge.

Appearances: Cynthia L. Strout, Attorney at Law, Anchorage, for the Appellant. Timothy W. Terrell, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, and Allard and Wollenberg, Judges.

Judge WOLLENBERG, writing for the Court.
Judge ALLARD, concurring.

Following a jury trial, Marquinn Jones-Nelson was convicted of first-degree murder in connection with the shooting death of Devante Jordan.[1] Jones-Nelson now appeals his murder conviction.

On appeal, Jones-Nelson raises two claims. First, Jones-Nelson argues that the superior court improperly limited his cross-examination of three of the State's witnesses. Specifically, Jones-Nelson contends that the court erred when it refused to allow his attorney to elicit testimony from these witnesses about Jordan's reputation for violence or about Jordan's prior violent acts until the defense attorney had first presented "some evidence" of self-defense — *i.e.*, other evidence (apart from the anticipated testimony of these three witnesses) to support each of the elements of a claim of self-defense. Jones-Nelson acknowledges that the "some evidence" test is the standard that governs whether a self-defense instruction is warranted, but he argues that this same test does not govern a judge's decision whether to admit evidence.

The State concedes that the trial court was wrong to require this foundational showing as a prerequisite to the admission of evidence of Jordan's reputation for violence or Jordan's prior violent acts. We agree. However, for the reasons explained in this decision, we conclude that the error was harmless.

Second, Jones-Nelson argues that the superior court gave an incorrect instruction to the jury on the law of self-defense. We agree with Jones-Nelson that this instruction was incomplete and potentially misleading: it failed to explicitly tell the jurors that, when they evaluated whether Jones-Nelson's use of deadly force was reasonable, they were required to judge his decision under the circumstances as they

---

[1]   AS 11.41.100(a)(1)(A). Jones-Nelson was also convicted of evidence tampering, AS 11.56.610(a)(1), and two counts of third-degree weapons misconduct, AS 11.61.200(a)(1). He does not appeal these convictions.

reasonably appeared to Jones-Nelson at the time (rather than under the circumstances as they turned out to be in retrospect).

But after carefully reviewing the record (in particular, the other jury instructions on self-defense and the final arguments of the parties), we conclude that this error did not appreciably affect the jury's verdict.

*Background facts and proceedings*

On the evening of March 23, 2011, Jones-Nelson and two of his friends attended a party at an Anchorage apartment. Jordan and some of his friends attended the same party.

At some point, Jordan confronted Jones-Nelson in a bedroom, accusing him of spreading the rumor that Jordan was a police snitch. During this confrontation, Jordan came within three feet of Jones-Nelson, and he was acting aggressively. However, Jordan ultimately left the room and returned to sit with his friends in the kitchen.

One of Jordan's friends who lived in the apartment, Nikita Sanders, could see that Jordan was angry. She asked him if he was "good," and Jordan replied that he was. But Jordan then asked another friend, Parrish Harris, whether he should "drop" Jones-Nelson. Sanders heard this comment, and she told Jordan, "Not in my apartment."

(Because Jones-Nelson was still in the bedroom, he did not hear Jordan's comment.)

A little later, Jones-Nelson called Harris into the bedroom and told him to fetch Jordan. Harris did so; moments later, Jordan came into the bedroom.

According to the testimony later given by Jones-Nelson and two of his friends (Dorian Topps and Dionte Wren), Jordan approached Jones-Nelson in an aggressive manner. He came within a foot and a half of Jones-Nelson, stood over him, and asked, "What's up?" (Jordan, who was about 6 foot 3 inches tall and weighed 170

pounds, was significantly bigger than Jones-Nelson, who was 5 foot 7 inches tall and weighed about 135 pounds.)

According to the defense witnesses, Jordan looked like he was going to hit Jones-Nelson. In addition, Topps (one of Jones-Nelson's friends) testified that he saw Jordan reaching for a handgun in his waistband as he approached Jones-Nelson. However, Wren (Jones-Nelson's other friend) testified that he did not see Jordan with a firearm, nor did he see Jordan actually try to hit Jones-Nelson.

Regardless of this discrepancy in the testimony, it is undisputed that Jones-Nelson pulled out a handgun and started shooting at Jordan. Jones-Nelson fired two shots in quick succession, at which point Jordan turned and ran toward the kitchen. As Jordan ran away, Jones-Nelson fired four more shots. Jordan died as a result of his wounds.

Following the shooting, Jones-Nelson fled the apartment, accompanied by Wren and Topps. Jones-Nelson's girlfriend was waiting outside in a car, and the four drove away from the apartment. When Jones-Nelson's girlfriend asked him what happened, Jones-Nelson replied that he had just "smoked" Jordan. Jones-Nelson later disposed of the handgun by tossing it over a bridge.

The next day, Jones-Nelson contacted a person to obtain a fake birth certificate and other false documents so that he could leave Alaska under a false identity. The person that Jones-Nelson contacted was secretly a federal informant, and she alerted the authorities to Jones-Nelson's plan. The police arrested Jones-Nelson when he went to retrieve the false documents. When Jones-Nelson was interviewed following his arrest, he denied being at the scene of the shooting.

At trial, there was no dispute that Jones-Nelson shot and killed Jordan. The only question was whether this shooting was justified by self-defense.

In his opening statement, Jones-Nelson's counsel asserted that Jones-Nelson shot Jordan in self-defense, after Jordan approached Jones-Nelson in an aggressive and threatening manner. The defense attorney told the jury that it would hear evidence of Jordan's reputation for violence, as well as specific incidents of Jordan's violent behavior. The defense attorney asserted that this evidence would show the reasonableness of Jones-Nelson's perception that Jordan was going to hurt him, and the reasonableness of Jones-Nelson's decision to use deadly force in response to this perceived threat.

Both Jones-Nelson and his friend Topps testified that Jordan approached Jones-Nelson in an aggressive manner, and that Jordan reached into his waistband for a gun. (As we noted earlier, Jones-Nelson's other friend, Wren, testified that he did not see Jordan reach for a gun.) Jones-Nelson testified that when he saw Jordan reaching for a gun, he was afraid that he would be pistol-whipped or shot, so he grabbed a revolver from the window ledge and started shooting at Jordan. Jones-Nelson conceded that, after the first few shots, Jordan dropped his gun and ran, but Jones-Nelson testified that he kept firing because he was afraid that Jordan's friends might have guns and might come to Jordan's aid.

The prosecutor argued that neither Jones-Nelson nor his friend Topps were credible witnesses, and that their testimony about Jordan reaching for a gun was false. The prosecutor asserted that Jones-Nelson never subjectively believed that he needed to use deadly force to repel an imminent attack.

The jury ultimately rejected Jones-Nelson's claim of self-defense and convicted Jones-Nelson of first-degree murder.

2650

*The court's limitation on the defense attorney's introduction of evidence regarding Jordan's reputation for violence and Jordan's prior violent acts*

Prior to trial, Jones-Nelson's attorney filed notice of his intent to support Jones-Nelson's claim of self-defense by introducing evidence of several prior violent acts by Jordan, as well as evidence of Jordan's reputation for violence.[2] At trial, the defense attorney initially sought to introduce some of this evidence through his cross-examination of three witnesses who either saw or overheard the shooting: Dionte Wren, Nikita Sanders, and her sister, Andronika Sanders.

The prosecutor objected to this proposed cross-examination on the ground that the defense attorney had not yet offered "some evidence" on every element of self-defense. In particular, the prosecutor argued that the proposed cross-examination would be improper until the defense attorney first offered evidence that Jones-Nelson subjectively believed that he was about to be killed or subjected to serious physical injury. (At that point in the trial, no witness had testified to seeing Jordan with a gun.)

The trial judge adopted the prosecutor's view of the law, and he sustained the prosecutor's objection to the proposed cross-examination. The judge ruled that Jones-Nelson's attorney could not elicit any testimony about Jordan's reputation for violence, or about Jordan's past acts of violence, until the attorney presented "some evidence" to support each element of Jones-Nelson's self-defense claim. Only later, after Topps testified that he saw Jordan reaching for a handgun as he approached Jones-Nelson, did the trial judge permit the defense attorney to introduce evidence of Jordan's prior acts of violence and reputation for violence.

---

[2] *See Loesche v. State*, 620 P.2d 646, 650 (Alaska 1980); *Johnson v. State*, 268 P.3d 362, 365-66 (Alaska App. 2012); *Allen v. State*, 945 P.2d 1233, 1241-42 (Alaska App. 1997); *McCracken v. State*, 914 P.2d 893, 898-99 (Alaska App. 1996).

On appeal, Jones-Nelson argues that the trial court improperly limited his attorney's cross-examination of Wren and the Sanders sisters. He argues that, even though the defense had not yet presented affirmative evidence that Jones-Nelson subjectively feared a deadly attack, the trial judge nevertheless should have allowed the defense attorney to elicit evidence regarding Jordan's reputation for violence and his prior violent acts.

The State concedes that the trial judge was wrong to require this foundational showing. We agree. While the "some evidence" test governs the question of whether a defendant is ultimately entitled to have the jury instructed on self-defense at the end of the trial,[3] this test does not govern the admissibility of evidence supporting a claim of self-defense during the trial.[4]

In particular, there is no rule that a defendant must first introduce evidence to support each element of self-defense before the defendant may introduce evidence of a decedent's prior acts of violence or their reputation for violence. Indeed, the defendant may rely on such evidence to establish the "some evidence" threshold for a self-defense instruction at the end of the trial. Thus, the trial judge was wrong to require Jones-Nelson's attorney to introduce independent evidence on each element of self-defense before the judge allowed the attorney to introduce evidence of Jordan's reputation for violence or his prior violent acts.[5]

---

[3]    *See* AS 11.81.900(b)(19); *Weston v. State*, 682 P.2d 1119, 1121 (Alaska App. 1984).

[4]    *See Savo v. State*, 382 P.3d 1179, 1181 (Alaska App. 2016) (noting that the determination of whether the defendant has presented "some evidence" to warrant a self-defense instruction "applies at the conclusion of the trial, after all the evidence has been received").

[5]    *See Lewis v. State*, 469 P.2d 689, 697 (Alaska 1970) (although the court generally has discretion to control the presentation of evidence, the court cannot exclude evidence based

(continued...)

We disavow any contrary implication in *Gottschalk v. State*, 881 P.2d 1139, 1143 (Alaska App. 1994) and *Deacon v. State*, 1993 WL 13156808, at *1 (Alaska App. June 23, 1993) (unpublished).

Although the trial judge was wrong to require this "some evidence" foundational showing, it is important to note that there are *other* foundational requirements that a defendant must meet before presenting this kind of evidence. These requirements differ depending on whether (1) the defendant is claiming that, as a matter of historical fact, the victim was the first aggressor, or (2) the defendant is claiming that he reasonably believed that he was about to be attacked with deadly force.

To prove the question of historical fact — *i.e.*, that the victim was actually the first aggressor — a defendant may introduce evidence of the victim's character for violence, and he need not establish that he was actually aware of the victim's violent character at the time of the altercation. However, this evidence must take the form of reputation or opinion evidence; the defendant may not introduce evidence of prior specific acts of violence.

In contrast, when the defendant seeks to prove the reasonableness of his fear that the victim was about to attack, the defendant can introduce any evidence pertaining to his contemporary knowledge of the victim's violent propensities. This includes not only what the defendant had personally observed about the victim's violent propensities in the past, but also what the defendant had heard from others about the victim's reputation for violence or the victim's specific prior acts of violence — provided that the defendant was aware of this information at the time of his altercation with the victim.

---

[5] (...continued)
on the misconstruction or misapplication of a legal rule).

We discussed these principles at length in *Allen v. State*, 945 P.2d 1233, 1239-43 (Alaska App. 1997) and *McCracken v. State*, 914 P.2d 893, 898-99 (Alaska App. 1996).

Moreover, there may be other foundational requirements that prevent or limit the introduction of this type of evidence.

For instance, in the present case, Jones-Nelson's attorney sought to cross-examine Wren about a 2008 altercation in which Jordan purportedly confronted Jones-Nelson, knocked him unconscious with a single punch, and pulled a gun on him. This evidence was offered to establish the reasonableness of Jones-Nelson's belief that he needed to use deadly force against Jordan. But Wren did not have personal knowledge of this prior incident, so the trial judge properly excluded his testimony as hearsay.

Finally, we acknowledge that there may be instances where there is a significant question whether the defendant will ultimately be entitled to a self-defense instruction, and where the trial judge is unable to resolve this question at the time the defense attorney seeks to introduce evidence of the victim's character for violence or the victim's prior acts of violence. In such instances, a trial judge retains the discretion to regulate the order of proof, so as to avoid the danger of prejudicing the jury with evidence that ultimately turns out to be inadmissible.[6]

In Jones-Nelson's case, however, we conclude that even if the trial judge should have allowed the defense attorney to cross-examine Wren and the Sanders sisters about Jordan's reputation for violence, or about Jordan's past violent acts, any error was rendered harmless later in the trial, when the defense attorney was able to introduce the same evidence through other witnesses.

---

[6] *See* Alaska Evid. R. 611(a) (vesting court with authority to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence").

Later in the trial, Jones-Nelson's attorney introduced testimony from a number of witnesses that Jordan was a violent person who often carried a gun, that Jordan was a "person of interest" in two prior shootings, and that he was involved in a third shooting. In addition, the defense attorney introduced evidence of the 2008 incident in which Jordan knocked out Jones-Nelson (the evidence that the judge excluded on hearsay grounds when the defense attorney sought to offer it through the testimony of Wren).

Indeed, at oral argument, Jones-Nelson conceded that he was ultimately able to introduce all of the evidence of Jordan's prior acts of violence and Jordan's character for violence that his trial attorney had initially sought to introduce through the cross-examination of Wren and the Sanders sisters. Jones-Nelson nevertheless contends that he was prejudiced by the trial judge's ruling because Wren and the Sanders sisters would have been particularly credible witnesses on the topic of Jordan's history of, and character for, violence.

But during the trial, Jones-Nelson's attorney acknowledged on several occasions that he could recall these three witnesses during the defense case — and yet he did not do so. In fact, the defense attorney later affirmatively declined to recall Nikita Sanders. We therefore reject Jones-Nelson's claim that the trial judge prevented him from eliciting the testimony of these three witnesses.

Jones-Nelson's defense attorney ultimately presented all of the evidence he wished regarding Jordan's character for violence and Jordan's prior specific acts of violence, and the defense attorney chose not to recall and question Wren and the Sanders sisters about these matters. For these reasons, we conclude that any error in the trial judge's initial ruling — the trial judge's refusal to allow the defense attorney to elicit this evidence by cross-examining Wren and the Sanders sisters during the State's case — did not affect Jones-Nelson's ability to present his defense.

*The self-defense jury instruction*

Jones-Nelson's jury was given two pattern jury instructions on the use of force in self-defense. One of these instructions described the law that governs the use of non-deadly force in self-defense, and the other instruction described the law that governs the use of deadly force.[7] The instruction on the use of deadly force correctly informed the jurors that a defendant who would be justified in using non-deadly force in self-defense may use deadly force when and to the extent that "the defendant reasonably believes" that deadly force is necessary to prevent imminent death or serious physical injury (or to prevent certain specified felonies).

However, at the prosecutor's request, the trial judge gave the jury a third instruction on self-defense that was intended to supplement the two pattern instructions. Jones-Nelson challenged this third instruction. Here is the language of that instruction:

> A basic tenet of the doctrine of self-defense is that [the] use of deadly force is unreasonable . . . if non-deadly force is obviously sufficient to avert the threatened harm. Even in circumstances when a person is permitted to use deadly force in self-defense[,] that person may still not be authorized to employ all-out deadly force because such extreme force is not necessary to avert the danger.

On appeal, Jones-Nelson argues that this instruction is incorrect because it suggests that the jury should retrospectively evaluate a defendant's use of deadly force to determine whether deadly force was in fact *objectively necessary*, rather than having the jury assess whether the defendant's use of deadly force was *reasonable under the circumstances known to the defendant at the time*.

Jones-Nelson correctly notes that a defendant may be justified in using deadly force (even "all-out" deadly force) if, under the circumstances known to the

---

[7]    See the pattern jury instructions for AS 11.81.330 and AS 11.81.335.

defendant, the defendant reasonably believed that this amount of force was necessary —
even if it later turns out that this belief was mistaken, and that lesser force would have
sufficed.[8]

We agree with Jones-Nelson that the wording of the challenged instruction
failed to unambiguously recite the concept of "reasonableness" that is central to the law
of self-defense. As we said in *McCracken v. State*:

> When a homicide defendant asserts that he or she acted in
> self-defense, the law does not require the defendant to prove
> that he or she actually faced imminent deadly attack. Even if
> the defendant's fear turns out to have been mistaken, the
> defense still may be established if the defendant proves that,
> under the circumstances, he or she reasonably feared
> imminent deadly attack at the hand of the victim.[9]

The question is not whether a defendant's use of force, and the level of
force used, was necessary in hindsight (or, using the language of the challenged
instruction, whether some lesser amount of force can now be seen to be "obviously
sufficient to avert the threatened harm"). Rather, the question is whether the defendant's
use of force, and the level of that force, was reasonable under the circumstances as they
were known to the defendant at the time.[10]

---

[8]   *See Weston v. State*, 682 P.2d 1119, 1121-22 (Alaska 1984); *McCracken v. State*, 914
P.2d 893, 898 (Alaska App. 1996).

[9]   *McCracken*, 914 P.2d at 898.

[10]   *See State v. Miller*, 798 N.W.2d 827, 831 (Neb. 2011) (noting, in analyzing a similarly
flawed instruction, that "[w]hat the jury believes is actually necessary in response to such a
threat with the benefit of calm hindsight is not the inquiry, because '[d]etached reflection
cannot be demanded in the presence of an uplifted knife'" (quoting *Brown v. United States*,
256 U.S. 335, 343 (1921))).

It is true, as the State argues, that the supplemental instruction correctly captured the concept that the defendant's use of force must be proportionate to the perceived danger. But, again, the question is what danger the defendant reasonably perceived at the time, and what degree of force the defendant reasonably believed was necessary to counter that perceived danger. The challenged instruction did not explicitly tell the jurors that they were required to evaluate Jones-Nelson's use of force from the perspective of a reasonable person in Jones-Nelson's circumstances.

That being said, we conclude that when the supplemental instruction is read in conjunction with the other jury instructions on self-defense, and in the context of the parties' closing arguments at Jones-Nelson's trial, there is little chance that the jurors would have been misled on this issue. Instead, we conclude that the jurors would have understood the principle that a defendant can validly use deadly force in self-defense if the person reasonably believed at the time that this force (and level of force) was necessary, even if it later turned out that the defendant's belief was mistaken.

As we noted earlier, the jury received two pattern instructions on the use of force in self-defense. Each of these instructions stated that, under the law of self-defense, a person is justified in using force if the person reasonably believed at the time that the use of this force was necessary. (A separate instruction defined the term "reasonably believes.") And in their closing arguments, both the prosecutor and the defense attorney repeatedly referred to this aspect of self-defense law.

Moreover, neither attorney referenced the challenged jury instruction during their closing arguments. In closing, the prosecutor primarily challenged the credibility of Jones-Nelson's claim that Jordan had a gun. He argued that Jones-Nelson never *subjectively* believed that it was necessary for him to use deadly force against Jordan. The prosecutor also argued that, regardless of Jones-Nelson's subjective belief,

it was unreasonable for Jones-Nelson to continue shooting Jordan after Jordan turned and ran back toward the kitchen.

We acknowledge that, at two points during his argument, the prosecutor used language that potentially suggested that the question was whether deadly force was "necessary," as distinct from whether deadly force was "reasonable." But read in the larger context of the prosecutor's argument, we interpret the prosecutor as properly asking the jurors to evaluate the reasonableness of Jones-Nelson's purported belief that he had to use deadly force, given the circumstances.

(We note that Jones-Nelson does not challenge, or even mention, these two segments of the prosecutor's argument.)

On appeal, Jones-Nelson points to the fact that the jury requested clarification of the self-defense instructions. He argues that this indicates that the supplemental jury instruction was prejudicial. But in a follow-up question, the jury explained that they were seeking clarification of two of the exceptions to the valid use of self-defense — namely, the provisions that preclude a claim of self-defense in instances of "mutual combat," or when deadly force is used "in revenge for, retaliation for, or response to actual or perceived conduct by a rival or perceived rival."[11] These exceptions are statutory, and they were set out in one of the pattern instructions that the court gave to the jury — not in the supplemental instruction.[12]

Viewing the jury instructions and the attorneys' arguments as a whole — including the attorneys' repeated references to the correct test as stated in the pattern jury instructions, and the fact that the attorneys never referred to the challenged supplemental

---

[11] *See* AS 11.81.330(a).

[12] *Id.*

jury instruction — we conclude that the error in the supplemental instruction did not appreciably affect the jury's verdict.

*Conclusion*

We AFFIRM the judgment of the superior court.

Judge ALLARD, concurring.

I write separately regarding the supplemental jury instruction on self-defense that the jury received in this case.

As explained in Judge Wollenberg's lead opinion, this jury instruction was intended to inform the jurors that, when a person uses force in self-defense, the amount or degree of this force must be proportionate to — *i.e.*, a reasonable response to — the danger *that the person reasonably believed they confronted*.[1]

The flaw in the challenged jury instruction was that it failed to include the principle stated in the italicized portion of the preceding sentence: the principle that the lawfulness of the defensive force must be judged in light of the circumstances as the defendant reasonably perceived them at the time. Instead, the instruction told the jurors that a person's use of force will be deemed unreasonable if a lesser degree of force was "obviously sufficient to avert the threatened harm," or if the person used an amount of force that was "not necessary to avert the danger."

The State notes that the wording of this jury instruction was drawn from a jury instruction on self-defense that this Court upheld in *Wilkerson v. State*.[2]

It is true that the jury instruction in Jones-Nelson's case was drawn, essentially *verbatim*, from the final two sentences of the jury instruction that we upheld in *Wilkerson*. But the jury instruction in *Wilkerson* contained an additional sentence that

---

[1]    See our extended discussion of this principle in *State v. Walker*, 887 P.2d 971, 978 (Alaska App. 1994).

[2]    *Wilkerson v. State*, 271 P.3d 471 (Alaska App. 2012).

expressly reminded the jury that a defendant's use of force must be judged from the defendant's reasonable perception of the circumstances.[3]

Jones-Nelson's case illustrates the danger of lifting language from appellate court decisions and then asking jurors to interpret and apply this language without the benefit of its original context. The fact that a jury instruction contains a *verbatim* quote from one of this Court's decisions does not guarantee that the instruction is an accurate or complete statement of the law. Thus, even when the language of a proposed jury instruction is drawn from an appellate court decision, trial judges and lawyers must still analyze the proposed instruction to make sure that it properly conveys the law.

---

[3] *See id.* at 474-75.